BROTHERHOOD of MAINTENANCE of WAY EMPLOYEES, Plaintiff & Counter–Defendant,

v.

ATCHISON, TOPEKA & SANTA FE RY. CO., et al.,

and

The Alabama Great Southern Railroad Co., et al., Defendants & Counterclaimants, and Defendant & Counterclaimant Intervenors.

No. 93 CV 5644.

United States District Court, N.D. Illinois, E.D.

Dec. 2, 1993.

Solomon I. Hirsh, Chicago, IL, John O.B. Clarke, Jr., Highsaw, Mahoney & Clarke, Washington, DC, for Broth. of Maintenance of Way Employees.

Ronald J. Cuchna, James P. Daley, Chicago & North Western Transp. Co., Chicago, IL, Richard T. Conway, Ralph J. Moore, Jr., David A. Bono, Shea & Gardner, Washington, DC, for Atchison, Topeka & Santa Fe Ry. Co., Burlington Northern Railroad Company, Chicago & Northwestern Transportation Company, CSX Transportation, Inc., Norfolk Southern Railway Company, Southern Pacific Rail Corporation, Southern Pacific Transportation Company, St. Louis Southwestern Railway Company, Denver & Rio Grande Western Railroad and Union Pacific Railroad Company.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Over two years have passed since Congress intervened to halt a national rail strike by passing legislation that it believed provided for the settlement of disputes between the railroads represented by the National Carriers' Conference Committee of the National Railway Labor Conference (the "NCCC") and certain labor organizations representing employees of those railroads. Almost two years have passed since the Brotherhood of Maintenance of Way Employees (the "BMWE") and the NCCC signed an Imposed Agreement that contained, according to the first paragraph of the document, the "terms necessary to implement" a Congressionally-imposed agreement.

The disputes nonetheless have continued. There is again the possibility that essential transportation services will be disrupted by a national rail strike, this time because the parties disagree about what the Imposed Agreement means and how and when the

railroads may implement it. It is under the cloud of this threat that the battle has shifted into this Court.

This matter is before the Court on cross motions for summary judgment by the BMWE as Plaintiff and the various railroads (the "Railroads") who are Defendants and Counterclaimants and Defendant and Counterclaimant Intervenors.[1] Also before the Court is the Railroads' motion for preliminary injunction against a strike by the BMWE over the disputed matters. For the reasons discussed below, the Railroads' motion for summary judgment is granted the BMWE's motion for summary judgment is denied, and an injunction against the threatened strike is ordered.

### Background

The relevant material facts are not in dispute. In June 1988, the BMWE and the Railroads exchanged proposals for changes in the then-existing collective bargaining agreement. The changes concerned rates of pay, work rules, and working conditions for the maintenance of way employees employed by the Railroads. From June 1988 through early May 1990, the BMWE and the Railroads (represented by the NCCC) attempted to resolve their disputes over the various changes sought. The parties were unable to resolve their differences and arrive at a mutually-acceptable agreement.

On May 3, 1990, President Bush, acting in accordance with the provisions of the Railway Labor Act ("RLA"), 45 U.S.C. § 160, issued executive order No. 12714 creating Presidential Emergency Board No. 219 ("PEB 219"). PEB 219's mandate was to conduct hearings and prepare a report on the disputes between the Railroads and the various labor organizations representing the Railroads' employees, including the BMWE. The report was intended to facilitate the parties' efforts to reach a new agreement.

PEB 219 issued its report on January 15, 1991. The report contained numerous find-

---

1. Defendants and Defendant Intervenors are railroads who were and are represented by the National Carriers Conference Committee ("NCCC") for purposes of negotiating national labor agreements with the various unions representing railroad employees. Plaintiff named as Defendants the following railroads: Atchison, Topeka & Santa Fe Ry. Co., Burlington Northern Railroad Co., Chicago & North Western Transportation Company, CSX Transportation, Inc., Norfolk Southern Railway Company, Southern Pacific Railway Company, Southern Pacific Transportation Company, St. Louis Southwestern Railway Company, Denver & Rio Grande Western Railroad Company, and Union Pacific Railroad Company. After the filing of the Complaint, the following railroads sought to intervene as Defendants and Counterclaimants pursuant to Fed.R.Civ.P. 24(a) or (b): The Norfolk & Portsmouth Belt Line Railroad Company, Northern Indiana Commuter Transportation District, Portland Terminal Railroad Company, The Alabama Great Southern Railroad Company, Alton & Southern Railway, Baltimore and Ohio Chicago Terminal Railroad, Central of Georgia Railroad Company, The Cincinnati, New Orleans and Texas Pacific Railway Company, Davenport, Rock Island and Northwestern Railway, Duluth, Winnipeg & Pacific Railway, The Georgia Northern Railway Company, Georgia Southern and Florida Railway Company, Houston Belt & Terminal Railway Co., Manufacturers Railway, Missouri Pacific Railroad, Norfolk and Western Railway Company, Northwestern Pacific R.R. Company, Peoria & Pekin Union Railway Co., Port Terminal Railroad Association, Richmond, Fredericksburg and Potomac Railway Co., St. Johns River Terminal Company, Tennessee, Alabama & Georgia Railway Company, Tennessee Railway Company, The Three Rivers Railway Co., Western Railway of Alabama, and The Wichita Union Terminal Railway Co. (Unopp. Mot. for Leave to Intervene as Defs. and Counterclaimants at Exh. A; Unopp. Supp.Mot. for Leave to Intervene as Defs. and Counterclaimants at Exh. A.) The railroads seeking to intervene argue that they are in the same position as Defendants vis-a-vis representation by the NCCC, participation in the collective bargaining process preceding Congressional imposition of the Imposed Agreement, imposition of rights and responsibilities under the Imposed Agreement and the statute at issue in the suit, applicability of the PEB 219 recommendations and CIC awards, and susceptibility to the strike threatened by the BMWE. (Unopp. Mot. for Leave to Intervene as Defs. and Counterclaimants at ¶¶ 1–7; Unopp.Supp.Mot. for Leave to Intervene as Defs. and Counterclaimants at 2.) Defendants and Defendant Intervenors (hereafter referred to collectively as the "Railroads") will be represented by the same counsel and will assert the same defenses and counterclaim. (Unopp.Mot. for Leave to Intervene as Defs. and Counterclaimants at 4; *see* Unopp.Supp.Mot. for Leave to Intervene as Defs. and Counterclaimants at 2.) The Court finds that the requirements for intervention are satisfied and therefore grants the Unopposed Motion for Leave to Intervene as Defendants and Counterclaimants and the Unopposed Supplemental Motion for Leave to Intervene as Defendants and Counterclaimants.

ings and recommendations with respect to the various changes sought by the BMWE and the Railroads. Some recommendations were favorable to the BMWE's membership. PEB 219 recommended, for example, both general wage increases and lump-sum cost-of-living adjustment payments for maintenance of way employees. Other recommendations were favorable to the Railroads. Those recommendations generally involved certain changes in work rules and working conditions that would result in greater flexibility in work scheduling for the Railroads.

It is fair to say that the BMWE's response to PEB 219's recommendations was less than enthusiastic. The BMWE's unhappiness with the PEB 219 recommendations is apparent from the Congressional testimony of its president:

> Despite carrier and administration claims to the contrary, the report of Presidential Emergency Board 219 does not represent a reasonable basis for settlement for the people we represent.
>
> . . . .
>
> . . . [W]e all know that the Board's report gives [the railroad industry] virtually everything they would have wanted in negotiations; that is if they had participated in meaningful negotiation.

(Exh. 2 to Counterclaim at 3 (*National Rail Strike: Hearing on H.J.Res. 222 Before the Subcomm. on Transportation and Hazardous Materials of the House Comm. on Energy and Commerce*, 102 Cong., 1st Sess. 63 (1991) (statement of Mac Fleming, Pres., Brotherhood of Maintenance of Way Employees).)

Despite the involvement of PEB 219, the BMWE and the Railroads were unable to agree on a new collective bargaining agreement. The BMWE struck the Railroads on April 17, 1992. Congress intervened and passed a joint resolution that required the BMWE to end its strike against the Railroads. *See* House Joint Resolution No. 222, Pub.L. No. 102–29, § 1, 105 Stat. 169 (1991). The President signed the resolution on April 18, 1991. Statement by President George Bush Upon Signing H.J. Res. 222, 1991 U.S.C.C.A.N. 99 (April 18, 1991).

Public Law No. 102–29 essentially imposed PEB 219's recommendations on the BMWE and the Railroads as their new collective bargaining agreement. The statute created a Special Board to consider the BMWE's and the Railroads' requests for clarifications, interpretations, and modifications of the PEB 219 recommendations. *Id.* at §§ 2–3, 105 Stat. 170–171. The recommendations as modified by the newly-created Special Board were to be binding on the BMWE and the Railroads "as though arrived at by agreement of the parties under the Railway Labor Act." *Id.* at §§ 1(3), 3(e), 105 Stat. 170, 171. The statute required the BMWE and the Railroads to restore the conditions that existed prior to the strike and to maintain that status quo until such time as PEB 219's recommendations became binding on the parties. *Id.* at § 1(1)–(2), 105 Stat. 169–170.

The Special Board issued its report on interpretations and clarifications of PEB 219's recommendations on June 11, 1991. (Exh. 3 to Counterclaim (Report of the Special Board (102–29), Interpretation and Clarification of the Report of Emergency Board No. 219 (Exec. Ord. No. 12714), June 11, 1991).) The Special Board issued its report on requests for modification on July 18, 1991. (Exh. 4 to Counterclaim (Report of the Special Board (102–29), Requests for Modification of the Report of Emergency Board No. 219 (Executive Order No. 12714), July 18, 1991).) All requests for modifications were denied. (*Id.* at 15.)

On February 6, 1992, the BMWE and the NCCC signed an "Imposed Agreement in Accordance with the Provisions of Public Law 102–20." (Exh. 5 to Counterclaim.) That agreement contained the "terms necessary to implement the report and recommendations of Presidential Emergency Board No. 219 . . . as clarified and modified by Special Board 102–29." (*Id.* at 1.)

A Contract Interpretation Committee ("CIC") was established to assist in resolving disputes over the interpretation of PEB 219's recommendations. Requests by either party for clarification or interpretation of the Imposed Agreement are directed to the CIC for resolution.

The Railroads began implementing the recommendations contained in PEB 219's report. Implementation required interpretation of PEB 219's "broad and general" recommendations. (See Exh. 9 to Counterclaim at 3 (CIC Interpretation of Unresolved Questions Concerning the 1991 National Agreement Between the Carriers Represented by the NRLC and the Employees Represented by the BMWE, Oct. 7, 1992).) The BMWE disagreed with the Railroads' interpretation of a number of the recommendations involving changes in work rules and working conditions.

The BMWE filed claims with the Railroads premised on its own interpretations of the PEB 219 recommendations. The BMWE also presented their disputes to the CIC and certain "Section 11 arbitrators" provided for in PEB 219's report. At present, between 800 and 900 claims are pending.

The CIC has issued numerous "awards" in the form of "answers" to "issues" presented by the BMWE and the Railroads. Subsequent to the issuance of certain awards favoring the BMWE, namely, those addressing issues concerning meal periods and washroom facilities, bulletining of meal periods, and bulletining of alternative work week schedules,[2] the BMWE presented the CIC with Issue No. 17, which asked

> Were the determinations of the Contract Interpretation Committee regarding Issues Nos. 10, 12 and 16 intended to be prospective only in their effect or retroactive?

(Exh. 11 to Counterclaim at 4.) On March 21, 1993, the CIC issued its answer. The CIC responded that

> The Neutral Member of the Contract Interpretation Committee does not have, nor does he desire to possess, the authority to create new terms and conditions of employment. The Neutral Member of the Committee does not function and has not acted as an interest arbitrator....
>
> ....

This Contract Interpretation Committee has been given the unenviable task of 'fine tuning' the agreement for the parties. It is the opinion of the Neutral Member of the Committee that the parties' inability to reach agreement on definitional matters such as 'what constitutes a "production gang"' or 'what constitutes a "washroom facility"' establishes no basis for our reaching backward and concluding that certain questions posed by the BMWE, which have resulted in answers favorable to the Organization, are properly given retroactive effect. On the other hand, where PEB No. 219 was specific and established, for example, increased allowances for meals and lodging, then those provisions obviously became effective as of the date of the agreement; and a carrier's failure to abide by those clear provisions would justify the payment of claims retroactively.

> ... [I]t is the opinion of the Neutral Member of the Committee that the determinations rendered on October 7, 1992 regarding Issues Nos. 10, 12 and 16, absent preponderant evidence to the contrary, were to be and must be applied prospectively as of that date.

(Exh. 10 to Counterclaim.)

The CIC's answer to Issue No. 17 exacerbated rather than resolved the disagreements between the BMWE and the Railroads over implementation of PEB 219's recommendations. According to the BMWE, "the corollary to [the CIC's opinion regarding retroactivity] is ... clear: until 'definitional' issues are resolved by voluntary agreement or by the C.I.C., the contract terms covering those issues have not yet been formed, and the pre-P.E.B. 219 terms and conditions of employment remain in place." (Exh. 12 to Counterclaim at 1 (Ltr. of May 21, 1993 from M.A. Fleming to Charles I. Hopkins, Jr.).) The BMWE took the position that work rule changes implemented by the Railroads prior to CIC resolution of "definitional questions" constituted "status quo violations" by the Railroads.

---

**2.** Issues No. 10, 12, and 16, and the corresponding awards by the CIC are set out in Appendix A to this Order.

(Exh. 15 to Counterclaim at 1 (Ltr. of June 23, 1993 from M.A. Fleming to Charles I. Hopkins, Jr.).)

As a result of the dispute over the Railroads' implementation of the disputed PEB 219 recommendations, the BMWE commenced informational picketing on July 19, 1993. (Exh. 18 to Counterclaim at 1.) The BMWE's president advised the Railroads that "[a]s a result of the persistence of the carriers in violating the status quo ... we will feel free to take whatever appropriate course of action which we may avail ourselves of [sic]." (Exh. 16 to Counterclaim at 1 (Ltr. of July 14, 1993 from M.A. Fleming and Charles I. Hopkins, Jr.).) After a series of meetings between representatives of the BMWE and the Railroads, the president of the BMWE advised the chairman of the NRLC that the BMWE's position was that the BMWE was "free to strike so long as the carriers continue to unilaterally implement their interpretations of PEB 219 work rules." (Exh. 25 to Counterclaim (Ltr. of Aug. 12, 1993 from M.A. Fleming to Charles I. Hopkins, Jr.).)

Plaintiff BMWE commenced this action against Defendant Railroads on September 15, 1993, by filing its Complaint for Declaratory Judgment or, in the Alternative, Petition to Set Aside Adjustment Board Award. In its complaint, the BMWE asks the Court to grant a declaratory judgment to resolve the dispute over the proper interpretation of Public Law 102–29 as it pertains to the Railroads' obligation to maintain the pre-PEB 219 status quo. (Compl. at 17.) Alternatively, the BMWE asks the Court to set aside the CIC's award with respect to Issue No. 17 as being inconsistent with the requirements of Public Law 102–29 and outside of the scope of the CIC's jurisdiction. (Compl. at ¶ 43–44.)

Defendant Railroads filed an answer and a counterclaim against the BMWE on September 29, 1993.[3] The Railroads seek a declaratory judgment that (1) the threatened strike is over minor disputes because those disputes concern the application and interpretation of the national agreement imposed by P.L. 102–29 and that, resultantly, the strike is unlawful under section 3 of the RLA; (2) the threatened strike violates the BMWE's statutory duty under section 2 First of the RLA to "maintain agreements;" (3) the strike will violate sections 2 First, 5 First and 6 of the RLA because it constitutes self-help to change an agreement without following the required procedures; and (4) the CIC's Award with respect to Issue No. 17 is valid and enforceable. (Ans. and Counterclaim of Defs. at 37–38.)

In addition, the Railroads ask the Court to enjoin the BMWE from authorizing, encouraging, or engaging in a strike or work stoppage over any disputes concerning the application or interpretation of the national agreement imposed by P.L. 102–29. (*Id.*) They also ask the Court to enjoin the encouragement of, authorization of, or engagement in any work stoppage over the disputes in question, and to enjoin the BMWE and its agents to "make all reasonable efforts to prevent" any such action. (*Id.*)

On October 6, 1993, the Railroads sought a Temporary Restraining Order enjoining the BMWE from resorting to strikes to resolve the disputes over implementation of the Imposed Agreement. The motion was withdrawn when the BMWE agreed to forebear self-help against the Railroads until either disposition of the motions now before the Court or the expiration of forty days, whichever was earlier. (Joint Stip. at ¶ 6, Oct. 8, 1993.)

**3.** Count I of the counterclaim alleges that any strike by the BMWE over the Railroads' implementation of the Imposed Agreement is unlawful and enjoinable under Section 3 of the Railway Labor Act ("RLA") because the disputes are "minor disputes" subject to mandatory arbitration. (Ans. and Counterclaim of Defs. at ¶¶ 50–51.) Count II alleges that the BMWE's strike threats violate the BMWE's duty under Section 2 First of the RLA to "maintain agreements," because such threats constitute an effort to prevent the Rail-roads from exercising their rights under the Imposed Agreement. (*Id.* at ¶¶ 53–54.) Count III alleges that the BMWE's threatened strikes violate sections 2 First, 5 First, and 6 of the RLA because they represent an effort by the BMWE to change an existing collective bargaining agreement without exhausting the statutorily required negotiation and mediation procedures. (*Id.* at ¶¶ 56–57.) Count IV alleges that the CIC's award on Issue No. 17 is valid and enforceable. (*Id.* at ¶ 59.)

On October 8, 1993, the Railroads filed a motion for preliminary injunction asking the Court to enjoin any strike by the BMWE until the Court has the opportunity to rule on the matters presented by the parties. (Counterclaimants' Mot. for Prel. Inj.) They argue that a preliminary injunction is appropriate because (1) the Railroads are likely to prevail on the merits of their claim that such strikes are unlawful under the RLA, and (2) any such strike will cause immediate and irreparable harm to the Railroads, their shippers, their employees, area commuters, and the public at large.

Plaintiff BMWE filed a motion for summary judgment in its favor on both the Complaint for Declaratory Judgment and the Counterclaim of Defendants and Defendant and Counterclaimant Intervenors on October 27, 1993. On November 8, 1993, the Railroads filed their cross-motion for summary judgment.

### Discussion

According to the Railroads, the disputes between the BMWE and the Railroads over various issues, namely, the effective date of the work rules imposed by P.L. 102–29, the size of production crews, the requirements for work site reporting, and the imposition of alternative work schedules by the carriers, are "minor disputes" subject to compulsory arbitration. The basis for their position is that the disputes concern the "interpretation or application" of railway labor agreements under 45 U.S.C. § 153 First (i) and *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1988) (hereafter, *Conrail*).

The Railroads argue that two corollaries flow from this characterization of the disputes as minor disputes. They maintain that this Court has no jurisdiction to resolve those disputes. They also maintain that any strike by the BMWE over these issues would be illegal inasmuch as minor disputes are subject to compulsory arbitration and cannot form the basis for lawful work stoppages.

The Railroads also argue that they are entitled to implement their own interpretations of the new rules. They point out that under current law they can implement a disputed interpretation of an agreement so long as their interpretation is "arguably justified" and "not frivolous or obviously insubstantial." *Conrail*, 491 U.S. at 307, 109 S.Ct. at 2482; *Brotherhood of Rail Trainmen v. Chicago River & Indiana R. Co.*, 353 U.S. 30, 39, 42, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). According to their analysis, their interpretation of each of the disputed rules (effective date, production crew size, work site reporting, and alternative work schedules) is "arguably justified" and "not frivolous or obviously insubstantial."

The BMWE disagrees that disputes over the interpretation of PEB 219's recommendations are "minor disputes" within the exclusive jurisdiction of adjustment boards. The BMWE argues instead that these are not "minor disputes" but a controversy over the proper application of P.L. 102–29 and the RLA in light of the CIC's decision on Issue No. 17. Hence, Plaintiffs reason, this Court has jurisdiction because the controversy involves the interpretation of a Congressional act regulating interstate commerce.

The essence of the BMWE's argument is that these disputes are not disputes over interpretation of the new agreement. They maintain that there is no new agreement as to the disputed issues unless and until the CIC rules on the "definitional disputes" concerning those issues. According to the BMWE, the CIC's ruling on Issue No. 17 that certain awards had prospective effect only means that there is no new agreement during the hiatus period between July 29, 1991 and the date on which the CIC issues its rulings on definitional disputes. According to the BMWE,

> [I]t is also clear that if the CIC's answer to Issue 17 ruled that the disputed definitional provisions of PEB 219's recommendations did not, and do not, become effective until the CIC resolves such disputes, then it follows as a matter of statutory construction that the status quo imposed by Section 1(2) of Public Law 102–29 continues to apply until the specific PEB 219 recommendation becomes 'binding on the parties' under Section 1(3) of that law.... Thus, the disputed question in this case is actual-

ly whether the answer to Issue 17, as its plain language states, decided that the 'provisions' of the imposed agreement on disputed definitional issues or ambiguous issues became 'effective' when decided by the CIC, or whether, as the carriers now assert, that ruling dealt simply with the effective date of the award, 'solely for purposes of determining whether carriers should be liable for "payment of claims retroactively." ' (Railroad's Memo at 7.)

(Mem. of Pl. in Opp. to Mot. by RRs for Summ. J. and in Reply to RRs' Opp. to Pl.'s Mot. for Summ. J. at 5–6.)

As we see it, the threshold question involves the proper interpretation of Public Law 102–29 and its provisions governing the point at which PEB 219's recommendations become binding on the parties. The answer to that question determines the whether or not the disputes are "minor" and whether or not the Railroads were entitled to implement the changes that they have already implemented. That determination in turn governs the lawfulness of any strike by the BMWE over these disputes.

The primary issue before the Court is straightforward. At what point do the provisions of Public Law 102–29 and the Imposed Agreement become binding on the parties, thereby entitling the Railroads to implement changes to work rules and working conditions in accordance with PEB 219's recommendations?[4] The answer determines whether or not the disputes over the Railroads' implementation of work rule and working condition changes are minor disputes. It determines who has jurisdiction to resolve the disputes and assess liability. Finally, it determines whether or not the BMWE is entitled to strike over the disputes.

4. The controversy thus is over the proper construction of a Congressional act regulating interstate commerce. That being the case, the Court agrees with Plaintiff BMWE that we have jurisdiction over this matter.

5. The BMWE admits as much in its Memorandum of Law in Support of Motion by Plaintiff Brotherhood of Maintenance of Way Employees for Summary Judgment and in Opposition to Motion by Defendants for a Preliminary Injunc-

If PEB 219's recommendations are not binding as of July 29, 1991, the changes in work rules and working conditions implemented by the Railroads constitute status quo violations of the pre-PEB 219 agreement. The National Railroad Adjustment Board would be the sole forum for determining liability for such violations. The BMWE might be entitled to strike over them. Summary judgment in favor of the BMWE on both the complaint and the counterclaim would be appropriate.

If, on the other hand, the recommendations as a whole became binding on July 29, 1991, the disputes are over the interpretation and application of the new Imposed Agreement.[5] The BMWE is not entitled to strike over them. The CIC has the exclusive jurisdiction to resolve them. The Railroads would be entitled to summary judgment in their favor with respect to both the Plaintiff's Complaint for Declaratory Judgment and their own Counterclaim, and might be entitled to an injunction.

According to the BMWE, Public Law 102–29 and the Railway Labor Act require the Railroads to preserve a work rule or condition that existed prior to the imposition of the new PEB 219–based agreement—the "status quo" in Railway Labor Act terminology—until the CIC resolves any dispute over the meaning of the PEB 219 recommendation that addresses that work rule or condition. According to the BMWE, the import of the CIC's award on Issue No. 17 is that "those recommendations that were ambiguous or definitional in nature where the parties could not have a meeting of the minds as to what is involved ... do not become effective until [the CIC] decides what the actual recommendations were." (Hrng. of November 12, 1993 before Plunkett, J., Tr. at 6 (hereafter, Tr.).)

tion, when it states that "there are disputes between the parties over the interpretation and application of both PEB 219's recommendations and the pre-PEB 219 agreements, and that those disputes are 'minor disputes' within the exclusive jurisdiction of the [Railway Labor] Act's adjustment boards." (Mem. of Law in Support of Mot. by Pl. BMWE for Summ. J. and in Opp. to Mot. by Defs. for a Prelim. Inj. at 8 n. 3.)

The BMWE bases its position on several factors. First, the CIC's answer to Issue No. 17 distinguished between PEB 219 recommendations that generated definitional disputes and those that were "specific and established." Second, the CIC's answer to Issue No. 17 stated that there is no basis for retroactive application of its rulings when there are definitional disputes and that therefore certain of its interpretive rulings were prospective only. Third, the Railroads are obliged under the RLA to abide by the pre-PEB 219 collective bargaining agreement until its work rules and conditions are changed pursuant to a new agreement. Reasoning from these factors, the BMWE concludes that the CIC award on Issue No. 17 creates a hiatus period during which certain terms of the Imposed Agreement do not become "binding" under Public Law 102–29.

The Railroads disagree. They argue that Public Law 102–29 by its terms makes PEB 219's recommendations binding on the parties as of July 29, 1991. They argue further that neither Public Law 102–29, nor the Imposed Agreement, nor the Railway Labor Act provide any basis for the BMWE's position that the Imposed Agreement is to be implemented gradually as definitional disputes and ambiguities in PEB 219's recommendations are resolved by the CIC. They conclude that Public Law 102–29 allows them to implement their own interpretations of PEB 219's recommendations regarding work rules and working conditions notwithstanding any disputes over the meaning of those recommendations.

## I. *The Meaning of Public Law 102–29*

In interpreting the relevant provisions of Public Law 102–29, " '[w]e begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Milwaukee Gun Club v. Schulz*, 979 F.2d 1252, 1255 (7th Cir.1992) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). "In ascertaining the plain meaning

of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988); *see also Milwaukee Gun Club*, 979 F.2d at 1255.

In this case, we consider first whether the plain language of the statute indicates that PEB 219's recommendations are to be binding gradually or are to be binding *in toto* at a particular point. We then consider whether anything in the statute allows the CIC to affect the date at which the PEB recommendations become binding.

Public Law 102–29 provides in pertinent part:

> (3) Except as provided in sections 3 and 4 of this joint resolution, the report and recommendations of Presidential Emergency Board No. 219 *shall be binding on the parties upon the expiration of the period described in section 3(e) of this joint resolution and shall have the same effect as though arrived at by agreement of the parties under the Railway Labor Act* (45 U.S.C. 151 *et seq.*).

Pub.L. 102–29 § 1(3), 105 Stat. 170 (emphasis added). Section 3 of the statute sets out a mechanism for the parties to submit requests to a Special Board for modifications to specific PEB 219 recommendations, *id.* at § 3(c)–(d), 105 Stat. 170, and provides that

> [u]pon the expiration of 10 days after the issuance of the determination of the Special Board under subsection (d) [regarding requested modifications], such determination shall be binding on the parties and shall have the same effect as though arrived at by agreement of the parties under the Railway Labor Act (45 U.S.C. 151 *et seq* ).

*Id.* at § 3(e), 105 Stat. 171. Section 4 provides that "[n]othing in this joint resolution shall prevent a mutual written agreement to any terms and conditions different from those established by this joint resolution." *Id.* at § 4, 105 Stat. 171.

The plain language of the statute supports the Railroads' interpretation. The "report and recommendations" of PEB 219 are

made "binding on the parties" "upon the expiration of the period described in section 3(e)." *Id.* at § 1(3). The period set out in section 3(e) began on July 18, 1991, the date of "issuance of the determination of the Special Board under subsection (d)," i.e., the date the Special Board issued its report on the parties' modification requests. *See id.* at § 3(e). That period expired "ten days after the issuance" of that report, in other words, on July 28, 1991. Parsing the language of the applicable statutory provisions, PEB 219's report and recommendations *in its entirety* became binding on the BMWE and the Railroads on July 29, 1991.

Nothing in the language itself leaves room for the concept of "gradual bindingness," as the BMWE calls its interpretation. The date the recommendations become binding is contingent solely on the date the statutorily-created Special Board issues its determination on modification requests. That date is defined with respect to "the report and recommendations" of PEB 219, not with respect to each individual recommendation.

The BMWE's interpretation is also inconsistent with the language and design of the statute taken as a whole. We cannot reconcile the BMWE's position with the statute's modification provisions. Those provisions create an extremely high threshold for efforts to modify PEB 219's recommendations. In so doing, they leave no room for doubt that—absent certain very limited conditions—Congress intended that PEB 219's recommendations would become the new agreement shortly after the statute was enacted.[6]

The language of section 3 strongly suggests that Congress intended a rather immediate implementation of PEB 219's recommendations. The statute contains an explicit presumption that those recommendations are valid.

In making a determination [on modification requests], the Special Board shall accord a presumption of validity to the rec-

ommendations of Presidential Emergency Board No. 219.... In order to overcome such presumption of validity, the party requesting a modification must show that the Presidential Emergency Board recommendation is demonstrably inequitable or was based on a material error or material misunderstanding.

*Id.* at § 3(d), 105 Stat. 170–171. The statute goes on to state that "the Special Board shall complete its review and issue a final determination on all requests [for modification]" "[n]o later than 30 days after the 10–day period described in subsection (c)." *Id.*

These provisions leave little room for doubt that Congress intended that the recommendations of PEB 219 were to become the terms of the new agreement. As the Special Board noted in its Report on Requests for Modifications, "[a]n unusually high burden of proof was placed by the Congress on any party seeking modification" of PEB 219's recommendations. (Exh. 4 to Counterclaim at 9.) To suggest, as the BMWE does, that either party could forestall implementation of those recommendations by raising a "definitional dispute" is to ignore the import of the presumption of validity.

To adopt the BMWE's interpretation would be to construe the statute in a manner that makes it internally inconsistent. One section would reflect the desire to impose a new national agreement without undue delay. Another would implicitly allow the parties to delay the effective date of any term of the new agreement by raising the issue of a "definitional dispute." This simply would not make sense. The plain language of the statute, taken as a whole, just does not support the BMWE's position that PEB 219's recommendations only become binding after definitional disputes and ambiguities are resolved by the CIC.

The Court's reading of the statute is fully supported by the statute's legislative histo-

---

6. Section 3(a) provides for the creation of a Special Board to respond to requests for modification of PEB 219's recommendations. *Id.* at § 3(a), 105 Stat. 170. Parties are entitled to "request the Special Board to modify any specific recommendation of Presidential Emergency

Board No. 219 with respect to any issue on which the parties remain in disagreement." *Id.* at § 3(c), 105 Stat. 170. The party requesting the modification has the burden of persuasion with respect to the requested modification. *Id.* at § 3(d), 105 Stat. 170–171.

ry.[7] As the chairperson of the House subcommittee sponsoring the joint resolution explained,

> [A] three-person special Board will be appointed. That Board will, first of all, settle ambiguities in the Presidential Emergency Board [sic]; second, consider issues on which there is disagreement between the parties where the PEB issued specific recommendations; .third, clarify other issues as requested by the parties....
>
> ....
>
> With the revisions by the Board, if any, minus any issues the parties have mutually agreed to, *the PEB is imposed [sic] and shall have the same effect as if the parties arrived at a mutual agreement* under the Railway Labor Act.

137 Cong.Rec. H2,367 (daily ed. Apr. 17, 1991) (statement of Rep. Swift) (emphasis added). That understanding was reiterated by other members of Congress during the debate.[8] *See, e.g., id.* at H2,364 (statement of Rep. Lent); *id.* at H2,368 (statement of Rep. Ritter). In light of such statements, we agree with the assessment of the Special Board that "[t]he legislative history of P.L. 102–29 indicates that the applicable modification procedures envision full implementation of PEB 219 recommendations with possible modification resulting only from conclusively exhibited unfairness." (Exh. 4 to Counterclaim at 9.) The legislative history does not support the BMWE's position. We consider next whether some term in the Imposed Agreement signed by the parties subsequent to the statute's enactment supports the BMWE's position.[9]

7. " 'If the plain language of the statute is clear, we do not look beyond those words to interpret the statute.' " *Milwaukee Gun Club v. Schulz,* 979 F.2d at 1255 (quoting *Kelly v. Wauconda Park Dist.,* 801 F.2d 269, 270 (7th Cir.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987)). We find that the language of Public Law 102–29 is clear with respect to the issue at hand. Nonetheless, we discuss briefly the insights that are provided by the statute's legislative history.

8. This is not to say that all Congresspersons favored imposing PEB 219's recommendations on the parties. Rep. Hayes, for example, expressed his desire that Congress
> move quickly to pass House Joint Resolution 222 to extend negotiations and set up a board

Unfortunately for the BMWE, this avenue is equally unavailing. The Court is unable to find anything in the Imposed Agreement that supports the view that CIC Award No. 17 creates a. hiatus in the implementation of PEB 219's recommendations. In fact, after reviewing the terms of the Imposed Agreement, the Court is even more mystified by the BMWE's position that the CIC's answer to Issue No. 17 somehow changes the date on which any PEB 219 recommendation becomes binding on the parties.

The signature page of that agreement recites that

> The attached document represents the Imposed Agreement terms necessary to implement the report and recommendations of Presidential Emergency Board No. 219, dated January 15, 1991, as clarified and modified by Special Board No. 102–29.
>
> This Imposed Agreement is based upon the provisions of Public Law 102–29, signed by the President on April 18, 1991, which declares that the report and recommendations of Presidential Emergency Board No. 219 as clarified and modified by Special Board 102–29 shall be binding effective July 29, 1991, on the participating carriers represented by the National Carriers' Conference Committee of the National Railway Labor Conference and certain of their employees represented by the Brotherhood of Maintenance Way Employees.

(Carriers' Exh. 5 at 1.) According to ·this language, the statutory provisions addressing

to further study the issues in dispute.. For the Congress to accept the recommendations of Presidential Emergency Board No. 219, I believe, would be tantamount to voting away railroad jobs, wages, and health care benefits without the consent of railroad workers.
*Id.* at H2,368 (statement of Rep. Hayes). Nonetheless, the joint resolution was passed as offered, and Rep. Hayes' objections were unavailing.

9. We consider the terms of the Imposed Agreement because Section 4 of Public Law 102–29 allows the parties to opt out of PEB 219's recommendations by mutual written agreement. Pub.L. No. 102–29 at § 4, 105 Stat. 171.

the point at which the recommendations become binding are expressly incorporated into the agreement. Furthermore, the statement that the Imposed Agreement contains the "terms necessary to implement the report and recommendations" of PEB 219 leaves no room for the concept that further work by the CIC is necessary before those recommendations become binding. In fact, the BMWE's position seems to be expressly contradicted by Section 2 of Article XIX of the Imposed Agreement. That section provides that

> The purpose of this Agreement is to fix the general level of compensation during the period of the Agreement, and to settle the disputes growing out of notices served by the Brotherhood of Maintenance of Way Employees ("BMWE") upon the carriers listed in Exhibit A dated on or about April 2, 1984 and June 10, 1988 and proposals served on or about April 9, 1984 and March 8, 1989 by the carriers ... This Agreement ... shall remain in effect through December 31, 1994 and thereafter until changed or modified in accordance with the provisions of the Railway Labor Act, as amended.

(Exh. 5 to Counterclaim at 29.)

The BMWE appears to recognize that there is little in the statute itself to support its position. The BMWE admits that section 1(3) of Public Law 102–29 "intended that the recommendations would become binding on [July 29, 1991]." (Mem. of Law in Support of Mot. by Pl. BMWE for Summ.J. and in Opp. to Mot. by Defs. for a Prelim. Inj. at 12.) The BMWE maintains, however, that "the CIC has ruled in its answer to Issue No. 17 that the recommendations should become binding over a period of time, depending on whether they were 'specific' or 'definitional in nature.'"[10] (Id.) The result, according to the BMWE, is that we must resolve the issue at hand "by examining both Public Law 102–29 and the Railway Labor Act *in light of the*

CIC's decision on Issue 17." (Id. at 10 (emphasis added).)

The problem with the BMWE's argument that Award No. 17 affects the meaning of sections 1(2) and 1(3) of Public Law 102–29 is that it is completely dependant upon an unsupported assumption. The BMWE assumes that an action by the CIC can modify the terms of a statute. In order for the BMWE to prevail on this issue given the plain language of the statute itself, that assumption absolutely must be correct. Yet the BMWE never explains the basis for its rather unique method of statutory interpretation.[11] In order for the award to have the effect posited by the BMWE, there must be some basis for concluding that the CIC had the authority to modify Public Law 102–29's explicit statutory provisions.

The Court finds that there is no support for the BMWE's position regarding the effect of the CIC's answer. As we read the Railway Labor Act, an adjustment board such as the CIC is authorized to resolve disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," 45 U.S.C. § 153 First (i) & Second, not to interpret or modify a statutory provision. The Court is not aware of any other case law or other statutory authority that allows an adjustment board like the CIC to amend the terms of a statute through an interpretive ruling. That leaves use with Public Law 102–29.

Unfortunately for the BMWE and fortunately for the Railroads, Public Law 102–29 does not provide a basis for the BMWE's position. The plain language of Public Law 102–29 contains no hint whatsoever that the import of its provisions may be or will be changed by subsequent actions or decisions of the CIC. Neither the CIC nor its subsequent actions or decisions are mentioned anywhere in the statute. The only entity entitled under the statute to affect *what* be-

---

**10.** As discussed below, the Court disagrees with this characterization of Award No. 17.

**11.** The BMWE's argument is also flawed because it is based on an incorrect reading of the CIC's answer to Issue No. 17. We will not spend time critiquing the BMWE's interpretation of Award

No. 17 at this point because we conclude that the CIC's interpretation cannot have the result sought by the BMWE. Suffice it to say that the Court's reading of the award does not comport with the interpretation offered by the BMWE.

comes binding on the parties or *when* it becomes binding is the Special Board. That body alone is given the authority to issue clarifications, interpretations, and modifications of PEB 219's recommendations prior to those recommendations becoming binding on the parties. *Id.* at § 3, 105 Stat. 170–171.

The legislative history does not suggest a contrary conclusion. It gives no indication of any Congressional intent to accommodate the result espoused by the BMWE. The CIC's actions cannot and do not modify the plain language of the statute itself.

After reviewing the language of Public Law 102–29, its legislative history, and the terms of the Imposed Agreement through which the statutory provisions were effectuated, we conclude that the recommendations of Presidential Emergency Board No. 219 became binding on the parties in their entirety on July 29, 1991. The Court finds no support for the BMWE's position that the subsequent action by the CIC modified the statute's provisions regarding the status quo period or the effective date of the recommendations. We turn our attention to the remaining issues before us.

## II. *Validity and Enforceability of CIC Award No. 17*

■ An adjustment board award may be set aside or remanded "for failure [of the board] to comply with the requirements of [the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the [board's] jurisdiction, or for fraud or corruption by a member of the [board] making the order." 45 U.S.C. § 153 First (q). The scope of this Court's review of an adjustment board award is " 'among the narrowest known to the law.' " *Union Pacific R. Co. v. Sheehan,* 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978) (quoting *Sheehan v. Union Pacific R. Co.,* 576 F.2d 854, 855–856 (10th Cir.1978)). As the Seventh Circuit has stated,

> [T]he question for decision by a federal court asked to set aside an arbitration award ... is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not

whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. [Citations omitted.]

*Hill v. Norfolk and Western Ry. Co.,* 814 F.2d 1192, 1195 (7th Cir.1987).

The BMWE asks us to set aside the CIC's award on Issue No. 17 "in so far as that award ruled that decisions of the adjustment board on 'definitional' or 'supremacy' issues were prospective only." (Compl. at 19.) According to the BMWE, the award is impeachable because it is in excess of the CIC's jurisdiction. (*Id.* at ¶ 42.) The BMWE asks us to remand the matter to the CIC so it may "conform its ruling to Public Law 102–29 as construed by this Court." (*Id.* at 19.)

As we understand it, the BMWE postulates two alternative arguments for why the CIC's ruling is impeachable, each based on a different reading of the ruling. They argue first that Award No. 17 is in excess of the CIC's authority if it purports to relieve the Railroads of liability for breaches of the new *PEB 219–based agreement* arising out of the Railroads' misjudgments of their obligations under that agreement. (Tr. at 18.) Alternatively, they argue that the Award exceeds the CIC's jurisdiction if it purports to relieve the Railroads of monetary liability under the *pre-PEB 219 agreement* because the CIC had no jurisdiction over that agreement. (Mem. of Pl. BMWE in Opp. to Mot. by RRs. for Summ. J. and in Reply to Rrs.' Opp. to Pl.'s Mot. for Summ. J. at 10.)

The Railroads maintain that the CIC acted within its jurisdiction. According to the Railroads, the CIC's award on Issue No. 17 is unimpeachable by its own terms because the arbitrator " 'asserted that he was construing PEB 219's recommendations,' which were imposed as the new National Agreement." (Mem. in Opp. to Pl.'s Mot. for Summ. J., in Support of Defs.'/Counterclaimants' Cross-Mot. for Summ. J., and in Reply to Pl.'s Opp. to Counterclaimants' Mot. for Prelim. Inj. at 10 (quoting Mem. of Pl. BMWE in Opp. to Mot. by Rrs' for Summ. J. and in Reply to Rrs' Opp. to Pl.'s Mot. for Summ. J. at 14).) The Railroads maintain that the CIC looked only to PEB 219's recommendations in deciding the retroactivity

question. (*Id.* at 13.) They argue further that the award was not contrary to either the RLA or the National Agreement because the CIC has the discretion to tailor remedies. (*Id.* at 13–14.)

■ Under the narrow standard of review applicable to this case, we hold that the CIC's award on Issue No. 17 is legal and enforceable. It interprets PEB 219's recommendations, not the pre-PEB 219 agreement. The CIC looked to the PEB 219 recommendations in reaching its conclusions. As a result, the award is not in excess of the CIC's jurisdiction.

Nothing in the language of the award suggests that the CIC intended to do anything other than interpret PEB 219's recommendations. The statement by the neutral member of the CIC that he "does not have, nor does he desire to possess, the authority to create new terms and conditions of employment. The Neutral Member of the Committee does not function and has not acted as an interest arbitrator" explicitly indicates that the CIC did not purport by its award to create a new agreement. (Exh. 10 to Counterclaim at 5.) The award does not even mention the pre-PEB 219 agreement. (See *id.*) According to the language of the award, the CIC viewed its task as one of "'fine tuning' the agreement of the parties." (*Id.* at 6.)

In arriving at its conclusion that the Awards on Issues 10, 12, and 16 should be prospective only, the CIC focused on PEB 219's recommendations. The CIC stated that

It is the opinion of the Neutral Member of the Committee that the parties' inability to reach agreement *on definitional matters such as 'what constitutes a "production gang"' or 'what constitutes a "washroom facility"'* establishes no basis for our reaching backward and concluding that

certain questions posed by the BMWE, which have resulted in answers favorable to the Organization, are properly given retroactive effect. On the other hand, *where PEB No. 219 was specific and established, for example, increased allowances for meals and lodging,* then those provisions obviously became effective as of the date of the agreement; and a carrier's failure to abide by those clear provisions would justify the payment of claims retroactively.

(*Id.* at 6–7 (emphasis added).) The "definitional matters" referred to arise in the context of PEB 219's recommendations. The reference in the second sentence is directly to PEB 219 recommendations. We find that the CIC was in fact interpreting PEB 219's recommendations.

The Court concludes, after careful consideration of the entire award and the context in which it was made, that the award did not purport to relieve the Railroads of monetary liability under the pre-PEB 219 agreements.[12] Rather, the import of the CIC's statement regarding retroactivity is that the particular recommendations at issue were too vague—as evidenced by the parties' inability to agree on their meaning—to impose liability on the Railroads for not interpreting them correctly in the first instance. That interpretation makes that statement perfectly consistent with the subsequent statement that retroactive payment of claims *would be appropriate* in instances involving the misinterpretation of "specific and established" recommendations. In other words, the CIC was saying that, while it would not levy retroactive claims in instances where the Railroads reasonably were incorrect, it would not stand by if the Railroads exhibited willful blindness and purported to "misinterpret" a recommendation that could have but one meaning.[13]

12. The BMWE asserts that the Railroads "assert that the CIC's award purported to relieve them of monetary liability under the pre-PEB 219 agreements." (Mem. of Pl. BMWE in Opp. to Mot. by Rrs for Summ J. and in Reply to Rrs' Opp. to Pl.'s Mot. for Summ. J. at 10.) As the Court reads the Railroads' argument, that characterization is inaccurate. The railroads assert, rather, that the award relieved them of liability for their

later-determined incorrect interpretation and application of the PEB 219 recommendations.

13. Admittedly, the CIC's explanation of its decision is not a model of clarity. The statement that "the parties' inability to reach agreement ... establishes no basis for our reaching backward and concluding that certain questions ... are properly given retroactive effect" might reasonably raise the question of whether the CIC meant

The CIC's award on Issue No. 17 is not impeachable as in excess of the CIC's jurisdiction. It does not change the effective date of PEB 219's recommendations. It does not extend the status quo period and then relieve the Railroads of liability for breaching their status quo obligations. Award No. 17 is legal and enforceable.

## III. The Nature of the Disputes and the Legality of Self–Help

The final controversy between the Railroads and the BMWE is over the nature of certain disputes between the parties and the legality of any self-help measures that might be taken by the BMWE. The Railroads maintain that the disputes over new work rule effective dates, production crew size, work site reporting, alternative work week schedules, and meal periods are "minor disputes" subject to compulsory arbitration under 45 U.S.C. § 153 First (i) and *Conrail.* The BMWE maintains that the dispute over the effective date of the new work rules is not a minor dispute as it is over the interpretation of the RLA and Public Law 102–29, not an agreement. The BMWE concedes, however, that certain other disputes are minor disputes.

A "minor dispute" is a dispute arising out of "the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). According to the Supreme Court, a minor dispute

'contemplates the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... [T]he claim is to rights accrued, not merely to have new ones created for the future.'

that the pre-PEB 219 agreement remained in place until the CIC ruled on definitional disputes. The statement must be viewed, however, in conjunction with the statement that the neutral member does not possess "the authority to create new terms and conditions of employment." The

*Conrail,* 491 U.S. at 303, 109 S.Ct. at 2480 (quoting *Elgin, Joliet & Eastern Ry. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945)).

■ There is little doubt that the disputes giving rise to the Railroads' counterclaim and motion for preliminary injunction (i.e., the disputes over production crew size, work site reporting, alternative work week schedules, and meal periods) are minor disputes subject to compulsory arbitration. As discussed above, the Imposed Agreement and PEB 219's recommendations became binding on the parties on July 29, 1991. There are PEB 219 recommendations pertaining to each of the areas in which the Railroads have instituted the challenged changes. (Exh. 5 to Counterclaim at 21 (Article VI—Meal Period), 22 (Article VIII—Work Site Reporting), & 23–24 (Article X—Alternative Work Week and Rest Days), 25 (Article XIII—Regional and System–Wide Gangs).) Thus, in *Conrail's* terms, there is an "existing agreement." The disputes are over the Railroads' subsequent actions to modify work rules and working conditions. As such, they are disputes over the validity of the Railroads' interpretation and application of sections of the new agreement and are properly categorized as "minor disputes."

The import of this determination is that the BMWE does not have the right to strike or avail itself of other forms of self-help over these disputes. Minor disputes are "subject to compulsory and binding arbitration before the National Railroad Adjustment Board, § 3, or before an adjustment board established by the employer and the unions representing the employees. § Second. [Such adjustment board] has exclusive jurisdiction over minor disputes.... Courts may enjoin strikes arising out of minor disputes." *Conrail,* 491 U.S. at 303–304, 109 S.Ct. at 2480–81. The Court concludes that any strike by the BMWE pursuant to the disputes ad-

Court does not agree with the meaning ascribed to the award by the BMWE: that the award changed the point at which PEB 219 recommendations became binding and extended the status quo period under sections 1(2) and 1(3) of Public Law 102–29.

dressed in the Railroads' Counterclaim would be unlawful under the RLA and *Conrail.*

The Court also concludes that it would be proper at this time to enjoin any strike or other form of self-help by the BMWE over the above-references disputes. The Court does not agree with the BMWE's position that the time is not ripe for such an action by the Court. Despite the BMWE's protestations to the contrary, the BMWE has provided sufficient indication that it intends to strike over these disputes for the Court to conclude that there is an imminent threat. We do not believe that it serves any purpose to force the Railroads to wait until the trigger is pulled before seeking the protection to which they are entitled consistent with this decision.

### *Conclusion*

Because we have addressed numerous issues above, and because the parties' requests for declaratory judgment and injunctive relief are quite extensive, we summarize the conclusions reached herein. In accordance with the terms of Public Law 102–29, the Court holds that PEB 219's recommendations, in their entirety, became binding on the BMWE and the Railroads on July 29, 1991. Consistent with that determination, the Court finds that the CIC, in making its determination with respect to Issue No. 17, interpreted the new agreement imposed on the BMWE and the Railroads by Congress pursuant to Public Law 102–29 and hence acted in a manner consistent with its jurisdiction under the RLA and the Imposed Agreement. We conclude, therefore, that the CIC award with respect to Issue No. 17 is legal and enforceable as against the BMWE and the Railroads. Finally, the Court finds that the disputes addressed in the Railroads' counterclaim are "minor disputes," and holds that any strike or other self-help by the BMWE against the Railroads over such disputes would be unlawful under the RLA.

Consistent with such findings and conclusions, the Court hereby grants Defendants and Counterclaimants' and Defendant and Counterclaimant Intervenors' Cross–Motion for Summary Judgment with respect to Counts I–IV of the Counterclaim, except to the extent that Count I of said Counterclaim alleges that the dispute over the effective date of PEB 219's recommendations is a "minor dispute." The Court denies Plaintiff BMWE's motion for summary judgment in its entirety.

It is hereby ordered that Plaintiff, its divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert with any of them be, and hereby are, permanently enjoined from authorizing, encouraging, permitting, calling, engaging in any strikes or work stoppages against, or picketing the premises of, Defendants and Counterclaimants and Defendant and Counterclaimant Intervenors over said parties' interpretation and application of PEB 219's recommendations, as clarified, interpreted, and modified by the Special Board, as imposed on Plaintiff, Defendants and Counterclaimants and Defendant and Counterclaimant Intervenors by Public Law 102–29.

### APPENDIX A

*Issue No. 10*

"For purposes of facilitating implementation of the applicable provisions of PEB No. 219, what is a washroom facility?"

*Answer to Issue No. 10*

The language of the Special Board is clear and unambiguous insofar as this subject matter is concerned. That is, the Special Board succinctly stated '[t]he PEB intended that washroom facilities should be provided where the job location requires on site meals'. There is no evidence to support a conclusion that the Special Board intended or considered anything more than employees' ability to 'wash' prior to their meal periods. Accordingly, it is the finding of the Neutral Member of the Committee that, while toilet facilities are not required, employees are entitled to have an opportunity, prior to their established meal period, to wash their hands before eating at the work site. The Neutral Member of the Committee agrees with the Organization's [i.e., the BMWE's] position that 'hand washing facilities, sufficiently proportionate to the crew size, which includes tepid water, sanitary soap [and/or solvents]

and toweling' is to be provided when the Carrier [i.e., the Railroad] requires employees to eat meals at on-site locations.

*Issue No. 12*

Was it the intent of PEB No. 219 that Article VI–J–Section 4, Meal Periods, changed or nullified existing local rules and practices which require hours of assignment, including meal periods, to be stipulated on job bulletins?

*Answer to Issue No. 12*

No, it was not the intent of PEB No. 219 to change or nullify existing rules and/or practices which require hours of assignment, including meal periods, to be stipulated on job bulletins.

. . . .

*Issue No. 16*

Existing rules and practices require carriers to bulletin and maintain fixed work weeks and rest days. Was it the intention of PEB No. 219 in Article VI–J–Section 5, Alternative Work Weeks and Rest Days, to abrogate such existing rules and practices · and allow carriers to change work weeks and rest days after bulletining and assigning positions? Or, was it the intention of PEB No. 219 that existing rules and practices requiring carriers to bulletin and maintain fixed work weeks would remain in effect?

*Answer to Issue No. 16*

PEB No. 219's Recommendation regarding Alternative Work Weeks and Rest Days did not address, directly or by implication, the question of existing bulletin and assignment rules and procedures. It is the finding and opinion of the Neutral Member of the Committee that the Recommendation of PEB No. 219 regarding Alternative Work Weeks and Rest Days and Article X of the Imposed Agreement, which granted the flexibility requested by the Carriers in establishing work week schedules, do not relieve a carrier from complying with the existing rules and procedures regarding the bulletining and assigning of employees to Alternative Work Week schedules.

(Exh. 9 to Counterclaim at 4–5, 7.)