BURLINGTON NORTHERN AND SANTA FE RAILWAY CO., et al., Plaintiffs,

v.

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, Defendant.

No. 4:00–CV–0441–A.

United States District Court, N.D. Texas, Fort Worth Division.

April 12, 2001.

Rick Glenn Sorenson, McDonald Sanders, Fort Worth, TX, Ralph J Moore, Jr, Donald J Munro, Shea & Gardner, Wash-

ington, DC, for Burlington Northern and Santa Fe Railway Company, plaintiff.

Rick Glenn Sorenson, Fort Worth, TX, Ralph J Moore, Jr, Donald J Munro, Shea & Gardner, Washington, DC, for Consolidated Rail Corporation, plaintiff.

Rick Glenn Sorenson, Fort Worth, TX, Ralph J Moore, Jr, Donald J Munro, Shea & Gardner, Washington, DC, John V Jansonius, Akin Gump Strauss Hauer & Feld, Dallas, TX, for CSX Transportation Inc, plaintiff.

Rick Glenn Sorenson, Fort Worth, TX, Ralph J Moore, Jr, Donald J Munro, Shea & Gardner, Washington, DC, for Kansas City Southern Railway Company, Norfolk Southern Railway Company and Union Pacific Railroad Company plaintiffs.

Sanford R Denison, Baab & Denison, Dallas, TX, Richard S Edelman, O'Donnell Schwartz & Anderson, Washington, DC, for Brotherhood of Maintenance of Way Employes, defendant.

Richard S Edelman, O'Donnell Schwartz & Anderson, Washington, DC, for Brotherhood of Maintenance of Way Employes, counter-claimant.

Sanford R Denison, Baab & Denison, Dallas, TX, Richard S Edelman, O'Donnell Schwartz & Anderson, Washington, DC, for Brotherhood of Maintenance of Way Employes, counter-claimant.

## MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

Now pending are the motion of plaintiffs, Burlington Northern and Santa Fe Railway Company ("BNSF"), Consolidated Rail Corporation ("Conrail"), CSX Transportation, Inc. ("CSX"), Kansas City Southern Railway Company ("KCS"), Norfolk Southern Railway Company ("INS"), and Union Pacific Railroad Company ("UP"), for summary judgment on their claims for declaratory and injunctive relief, the motion of defendant, Brotherhood of Maintenance of Way Employes, ("BMWE") for summary judgment, and plaintiffs' motion for summary judgment on BMWE's counterclaim. The court, having considered the motions,[1] the responses, the record, the summary judgment evidence, and applicable authorities, makes the following determinations.

## I.

### Plaintiffs' Claims

On May 23, 2000, plaintiffs filed their complaint for declaratory and injunctive relief in which they allege that:

Plaintiffs are common carriers by rail under the Interstate Commerce Act and carriers as defined in § 1 First of the Railway Labor Act, 44 Stat. 577, as amended, 45 U.S.C. §§ 151–88 ("RLA"). They are represented by the National Carriers' Conference Committee ("NCCC") for purposes of national collective bargaining agreement issues. BMWE is an unincorporated association and a labor organization as defined in the RLA that is the collective bargaining representative under the RLA of the craft or class of maintenance of way employees employed by plaintiffs.[2] BMWE has pursued, and continues to pursue, a policy or practice of striking over minor disputes by characterizing any action of plaintiffs with which it

---

1. Plaintiffs' motions are titled motions for partial summary judgment only because they address their claims and defendant's counterclaim in separate motions.

2. The allegations described in this sentence and in the two sentences immediately preceding it are admitted by defendant in its answer. Thus, they state undisputed facts for summary judgment purposes.

disagrees as a "unilateral change." The union's pattern, policy, or practice of striking constitutes a violation of its statutory obligation to exert every reasonable effort to settle disputes without interruption of railroad transportation as set forth in 45 U.S.C. § 152 First.

Plaintiffs pray for declaratory judgment that (1) BMWE's authorizing, encouraging, permitting, calling, or engaging in strikes, work stoppages, picketing, or other self-help against plaintiffs and their subsidiaries over any disputes involving what BMWE claims are unilateral changes in agreements, without prior notice to plaintiffs, is a violation of § 152 First, and (2) BMWE's pattern, practice or policy of engaging in conduct of that kind is a violation of § 152 First. Plaintiffs seek an injunction requiring BMWE, its divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert or participation with any of them, to provide at least ten days' notice to plaintiffs prior to engaging in the described conduct during the period prior to exhaustion of the major dispute procedures.

## II.

### BMWE's Answer and Counterclaim

BMWE takes the position that plaintiffs' complaint fails to state a claim upon which relief can be granted, and specifically alleges that the Norris–LaGuardia Act, 47 Stat. 70, 29 U.S.C. §§ 101–15, ("NLGA") prevents the court from granting the relief sought by plaintiffs and that § 152 First does not apply to disputes other than those over the conduct of bargaining. In the alternative, BMWE counterclaims against plaintiffs for a declaration that plaintiffs violate § 152 First by a policy and practice of asserting that disputes must be arbitrated while plaintiffs continue to act in accordance with their contract interpretations that they claim require arbitration, and

continue to act in accordance with their contract interpretations even after they have been rejected in arbitration.

## III.

### The Motions for Summary Judgment

Plaintiffs moved January 31, 2001, for summary judgment, contending that the summary judgment record establishes as a matter of law their right to the relief they seek by their complaint. In addition, plaintiffs filed a motion for summary judgment as to BMWE's counterclaim, asserting, in effect, that there is no summary judgment evidence to support the assertion by BMWE that plaintiffs have violated § 152 First "as a result of their handling of disputes with the BMWE, either pending or following arbitration." Carriers' Mot. for Partial Summ.J. on BMWE's Countercl. at 1–2.

BMWE has moved for summary judgment as to plaintiffs' request for declaratory and injunctive relief, assigning as grounds of its motion that (1) "the Court lacks jurisdiction over [plaintiffs'] complaint since it does not involve an actual case or controversy as required by Article III of the Constitution," (2) "[§ 152] First does not provide a basis for the claims asserted by [plaintiffs]," and (3) "the injunctive relief [plaintiffs] seek is barred by the Norris LaGuardia Act." Def.'s Mot. for Summ.J. or Alternatively for Dismissal Pursuant to 12(B)(1) at 2.

## IV.

### The Legal Context

Before discussing the undisputed summary judgment evidence, the court provides a legal context by discussions of the purpose and scheme of the RLA, and the distinctions between minor and major disputes.

A. *The Purpose and Scheme of the Railway Labor Act:*

The core dispute resolution duties imposed by the RLA on carriers and their employees are defined at 45 U.S.C. § 152 First and Second as follows:

**First. Duty of carriers and employees to settle disputes**

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

**Second. Consideration of disputes by representatives**

All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

Consistent with those provisions is the description of the purpose and scheme of the RLA found in *Delaware & Hudson Railway Co. v. United Transportation Union* as follows:

The purpose and scheme of the Railway Labor Act is to "provide a machinery to prevent strikes" and the resulting interruptions of interstate commerce. As to minor disputes the Act provides for compulsory arbitration. As to major disputes, ... the Act's machinery operates not to prohibit strikes but to delay them in order to assure ample opportunity for negotiation and mediation.

450 F.2d 603, 607 (D.C.Cir.1971) (footnote omitted).

Two of the questions presented to the Supreme Court in *Chicago & North Western Railway Co. v. United Transportation Union* were "whether [45 U.S.C. § 152] First imposes a legal obligation on carriers and employees or is a mere exhortation" and "whether the obligation is enforceable by the judiciary." 402 U.S. 570, 574, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). After recalling its observation in an earlier case that the heart of the RLA is the duty imposed by § 152 First, the Court said:

[W]e think it plain that § [152] First was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis.

*Id.* at 577, 91 S.Ct. 1731. And, the Court added, "[W]e think the conclusion inescapable that Congress intended the enforcement of § [152] First to be overseen by appropriate judicial means...." *Id.* at 581, 91 S.Ct. 1731. Section 152 Second and the other provisions of the RLA, serve to define congressionally mandated techniques for the accomplishment of the goal of § 152 First.

B. *"Major" versus "Minor" Disputes:*

A distinction exists between changes in working conditions that are "major" changes and those that are "minor." In *Elgin, Joliet & Eastern Railway Co. v. Burley,* the Supreme Court explained the difference between disputes concerning the making of collective agreements ("major disputes") and those over grievances ("minor disputes"), saying:

The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it

is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

More recently, the Court restated the test in determining the difference between major and minor disputes by explaining:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 307, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).

■ The RLA provides a method of resolution of minor disputes if agreement cannot otherwise be reached, mandating in 45 U.S.C. § 153 First (i) that:

> The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

This dispute resolution procedure is compulsory. *Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30, 33–39, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). *See Bhd. of Locomotive Eng'rs v. Missouri–Kansas–Texas Ry. Co.*, 363 U.S. 528, 531, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) ("[T]he superseding purpose of the Railway Labor Act [is] to establish a system of compulsory arbitration for [minor disputes], a purpose which might be frustrated if strikes could not be enjoined during the consideration of such a dispute by the [National Railroad Adjustment] Board."); *Burlington N.R.R. v. BMWE*, 961 F.2d 86, 89 (5th Cir.1992) ("Section 153 First (i) mandates compulsory arbitration to resolve minor disputes."). "[A]ny strike or other self-help by the BMWE against the Railroads over [minor] disputes would be unlawful under the RLA." *BMWE v. Atchison, Topeka & Santa Fe Ry. Co.*, 840 F.Supp. 1221, 1236 (N.D.Ill.1993). The courts have the responsibility to enforce the mandatory compulsory arbitration obligation because "[w]hen an illegal strike occurs over a minor dispute, the employees or the union have violated not only § 152

First but also § 153 First (i)." *Burlington N.R.R.*, 961 F.2d at 89.

The procedures to be followed in the event of a major dispute were described in *Consolidated Rail Corp.* as follows:

> The statutory bases for the major dispute category are § 2 Seventh and § 6 of the RLA, 48 Stat. 1188, 1197, 45 U.S.C. § 152 Seventh and § 156. The former states that no carrier "shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements" or through the mediation procedures established in § 6. This statutory category
>
> > "relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Burley*, 325 U.S. at 723, 65 S.Ct. 1282.
>
> In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. §§ 5 and 6. Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions.... once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force.

491 U.S. at 302–03, 109 S.Ct. 2477 (footnote omitted).

■ A significant difference between the practices related to major and minor disputes is that neither side can unilaterally implement a policy or program that is the subject of a major dispute, while the subject of a minor dispute can be implemented pending arbitration. *See Consol. Rail Corp.*, 491 U.S. at 304, 109 S.Ct. 2477; *Int'l Bhd. of Teamsters v. Southwest Airlines, Inc.*, 875 F.2d 1129, 1133 (5th Cir. 1989) (en banc). Accordingly, the characterization of the dispute as major or minor is often a threshold issue in litigation between a railroad and a union.

■ In the case of a major dispute, "[t]he parties are obligated to refrain from self help while the Act's procedures are being pursued." *Delaware & Hudson Ry. Co.*, 450 F.2d at 607. If self help is prematurely sought, injunctive relief can be granted. *Consol. Rail. Corp.*, 491 U.S. at 303, 109 S.Ct. 2477.

## V.

### *Undisputed Summary Judgment Evidence*

The following evidence pertinent to the rulings being made on the pending motions is undisputed in the summary judgment record:

Throughout history, relations between railroads and their workers have often been stormy. As another judge noted, "the origins of this matter (as well as many other disputes) can probably be traced back prior to 1894, when Eugene V. Debs led members of the American Railway Union in a turbulent strike against the Pullman Palace Car Company of Illinois." *Alton & Southern Ry. Co. v. BMWE*, 883 F.Supp. 755, 756 (D.D.C.1995). More recently, relations were strained at the conclusion of the 1988 round of collective bargaining between the parties. BMWE and several other unions were unable to reach agreements with the carriers. Consequently, President Bush created Presiden-

tial Emergency Board 219 ("PEB 219") to investigate and report on the disputes. PEB 219 issued a report containing a series of recommendations that made BMWE, "very, very upset." Carriers' App. at 144. Although other unions reached settlements, BMWE instituted a strike on April 17, 1991. The following day, Congress stepped in to end the strike by enacting Public Law No. 102–29, 105 Stat. 169 (1991). As a result, BMWE was forced to enter into an imposed agreement with the carriers. BMWE responded with a mailing titled "We've Been Worked Over On the Railroad," warning: "Since management and the federal government are not taking our concerns seriously, we have no choice but to consider work stoppages"; and "[w]e want to let shippers and the public know that railroaders are fed up with these conditions—and the result could be a disruption in rail services." Carriers' App. at 146–47. The mailing also stated that BMWE "want[ed] the railroads to stop imposing their own interpretations of PEB 219 on us." *Id.* at 146.

The imposed agreement allowed for reopening negotiations in November 1994. Once again, the parties were unable to reach agreement. Consequently, President Clinton appointed Presidential Emergency Board 229 ("PEB 229"), which issued its report in June 1996. *BMWE v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 639 (7th Cir.1997). This time, the railroads and BMWE averted a strike by accepting the pertinent recommendations of PEB 229 and entering into a new national agreement (the "1996 national agreement"). Still, unrest continues. The pace of strikes has accelerated since November of 1999 when the parties entered into a new round of collective bargaining over proposed changes in existing agreements.

Since the summer of 1993, BMWE has struck, attempted to strike, or threatened to strike plaintiffs at least eighteen times, including nine cases in which pickets went up and/or operations were disrupted until the affected plaintiff was able to obtain a temporary restraining order.[3] In the last year, BMWE has accelerated its practice of strikes against plaintiffs, with four incidents since February 2000. In each case, BMWE planned its strike in secret and made every effort to implement the strike before the affected carrier could obtain a temporary restraining order.

In 1993, Conrail filed suit against BMWE in the United States District Court for the Eastern District of Pennsylvania. *Consol. Rail Corp. v. BMWE*, 847 F.Supp. 1294 (E.D.Pa.1994). It sought a permanent injunction preventing a threatened strike by BMWE and a declaration that, under the provisions of the RLA, BMWE was prohibited from striking over issues that were "minor disputes." In support of its request for injunctive relief, Conrail relied on a memorandum circulated by the general chairman of two of BMWE's local federations seeking authority to conduct a strike over eleven potential strike issues. *Id.* at 1298. The memorandum recognized that:

> . . . even during a short strike or threatened strike, Conrail stands to lose substantial revenue. In addition, customers who have alternatives to ship other than rail, often will not deal with a railroad that has labor problems. This by itself puts tremendous pressure on management to resolve disputes rather than

---

**3.** The court accepts plaintiffs' characterization of a situation as a threat to strike if BMWE refused to provide assurances that it would not strike. The summary judgment evidence establishes that, whether BMWE has made a strike decision or not, BMWE's position is, and has historically been, that it "will do what it has to do" to protect its members.

face continued unrest from the membership.

*Id.* at 1300.[4] However, Conrail could not point to any action taken by BMWE to follow up on its strike authorization letter. And, BMWE presented testimony that it was not threatening a strike against Conrail. *Id.* at 1303. The district court denied the relief sought. *Id.* at 1307. Less than two months later, on May 20, 1994, Conrail sought and obtained a temporary restraining order halting a strike because the disputes between Conrail and BMWE were disputes under the Federal Railroad Safety Act, all of which were subject to resolution exclusively by the National Railroad Adjustment Board or other board of adjustment created pursuant to § 3 of the RLA. *Consol. Rail Corp. v. BMWE,* No. 94–3124, slip op. (E.D.Pa. May 20, 1994).

In 1993, BMWE commenced an action in the United States District Court for the Northern District of Illinois, Eastern Division, seeking a declaratory judgment to resolve a dispute over the proper interpretation of Public Law 102–29. *BMWE v. Atchison, Topeka & Santa Fe Ry. Co.,* 840 F.Supp. 1221 (N.D.Ill.1993). The defendant railroads in that action filed a counterclaim seeking, among other things, a declaratory judgment that a threatened strike was over minor disputes and, therefore, unlawful. The court found that the plain language of the statute at issue supported the railroads' interpretation. *Id.* at 1229. Because the court found that there was an imminent threat of strike, it granted the injunctive relief sought by the railroads. *Id.* at 1236.

Also in 1993, a predecessor of BNSF filed a complaint in the United States District Court for the Northern District of Illinois, Eastern Division, seeking injunctive relief to prevent BMWE from striking over refusal to pay away-from-home allowances. *Burlington N.R.R. v. BMWE,* No. 93 C 6019, slip op. (N.D.Ill. Oct. 22, 1993). The court found that the dispute between the parties was minor and granted a permanent injunction. The parties agreed that it would be in their best interests to resolve the dispute in an expedited manner. Therefore, the court ordered expedited arbitration as a condition of the strike injunction. *Id.* at 22–23.

In 1994, a predecessor of BNSF sought and obtained a temporary restraining order in the United States District Court for the Northern District of Illinois, Eastern Division, to restrain BMWE from striking over the plaintiff's decision to implement special workweeks and/or special starting times on certain projects. *Atchison, Topeka & Santa Fe Ry. Co. v. BMWE,* No. 94 C 2765, slip op. (N.D.Ill. May 4, 1994). The court found that BMWE's protest at most gave rise to a minor dispute. *Id.* at 2. The court later ordered the parties to settle the matter on an expedited basis. *Id.,* Tr. of May 16, 1994, hr'g. The parties thereafter filed a stipulation of dismissal.

In 1994, a group of twenty-nine rail carriers filed suit in the United States District Court for the District of Columbia seeking a declaratory judgment that BMWE was obligated to bargain on a national-handling basis with a multi-employer bargaining representative, and an injunction ordering BMWE to bargain on such basis. *Alton & S. Ry. Co. v. BMWE,* 883 F.Supp. 755 (D.D.C.1995). On March 17, 1995, they filed a motion for prelimi-

---

**4.** This memorandum, which is part of the summary judgment evidence, also makes the statement that "even the pressure that comes from a strike that is halted by a Federal Judge is sometimes useful in leading to a resolution of the dispute in question," which is immediately followed by the statement, "[t]his is because even during a short strike or a threatened strike, Conrail stands to lose substantial revenue." Carriers' App. at 173.

nary injunction seeking to enjoin BMWE from engaging in a strike or any other form of self-help because the parties had not yet exhausted their remedies under the RLA. *Id.* at 758. The parties stipulated that a strike was imminent and that irreparable injury would occur if the BMWE were to strike against one or more of the carriers. *Id.* at 764. Because of the high risk of imminent irreparable injury, the court found that injunctive relief would be appropriate even if the carriers' likelihood of success on the merits were quite slim. The court further found that because the RLA's long and drawn-out procedures had only just begun, any attempt by the BMWE to alter the status quo by exercising self-help would be quite premature, would cause irreparable harm, and would be contrary to the public interest. Accordingly, the court granted the request for preliminary injunction. *Id.* at 765.

Later that year, BMWE violated the injunction by picketing Conrail. The court found that BMWE's argument that the preliminary injunction did not apply to its picketing was dependent on either a mischaracterization of what BMWE was doing or a misunderstanding of what the court's previous opinion said. The court ordered BMWE to cease and desist from its picketing. *Alton & S. Ry. Co. v. BMWE,* No. 94–2365(TFH), slip op. (D.D.C. Dec. 15, 1995).

In August 1995, CSX filed a verified complaint and motion for preliminary injunction in the United States District Court for the Middle District of Florida, Jacksonville Division. *CSX Transp., Inc. v. BMWE,* No. 95–813 CIV–J–16 (M.D.Fla. 1995). The court issued a preliminary injunction restraining BMWE from striking or engaging in any related activities. The court found that CSX had shown that the existing work stoppage or strike was over a minor dispute and could be resolved based upon an interpretation of the existing collective bargaining agreement in the light of past practices of the parties in interpreting and applying that agreement.

In December 1995, CSX and BMWE again appeared in the United States District Court for the Middle District of Florida, Jacksonville Division, this time in Case No. 95–957 CIV–J–10. The dispute concerned certain production gang agreements. The parties were currently in mediation and the court found that the agreement in dispute remained in effect as part of the status quo. The court found BMWE's arguments justifying its actions to be frivolous. Thus, the court granted the relief sought by CSX. *CSX Transp., Inc. v. BMWE,* No. 95–957 CIV–J–10, slip op. (M.D.Fla. Dec. 20, 1995).

In November 1996, NS received information that BMWE would strike over travel time and tenure protection. The United States District Court for the Western District of Virginia, Roanoke Division, granted a temporary restraining order. *Norfolk S. Ry. Co. v. BMWE,* slip op. (W.D.Va. Nov. 8, 1996).[5] The case was then transferred to the United States District Court for the Central District of Illinois, where it was consolidated with another pending action. The question before the court was whether the carriers' position that a provision regarding travel payments applied only to regional and system gang employees was a major or minor dispute under the RLA. *BMWE v. Atchison, Topeka & Santa Fe Ry. Co.,* Nos. 96–1515 and 96–1524, 1996 U.S.Dist. Lexis 21132 (C.D.Ill.Dec. 17, 1996). The court

---

**5.** A copy of the order is found at Carriers' App. at 368. It does not include reference to a civil action number.

found that the dispute was a major one, but granted a strike injunction pending an appeal. The Seventh Circuit thereafter reversed the decision of the trial court, finding that the dispute was minor. *BMWE v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635 (7th Cir.1997). In accordance with the mandate, the district court then granted a permanent injunction against strikes over that dispute. *BMWE v. Atchison, Topeka & Santa Fe Ry. Co.*, Nos. 96–1515 & 96–1524, slip op. (C.D.Ill. May 19, 1998).

On June 17, 1997, the United States District Court for the District of Colorado granted a similar injunction preventing BMWE from striking over the application of Article XIV of the parties' September 26, 1996, collective bargaining agreement, finding that such a strike was over a minor dispute. *Alton & S. Ry. Co. v. BMWE*, No. 97–B–738, slip op. (D.Colo. June 17, 1997).

In November 1997, United States District Court for the Northern District of Illinois, Eastern Division, granted a preliminary injunction in favor of Conrail in joining a threatened strike by BMWE over a minor dispute. *BMWE v. Consol. Rail Corp.*, No. 97–C–2016, slip op. (N.D.Ill. Nov. 21, 1997). In 1998, the court granted a permanent injunction on the same matter. *BMWE v. Consol. Rail Corp.*, No. 97–C–2016, slip op. (N.D.Ill.1998). BMWE's appeal of the order was dismissed. Carriers' App. at 438.

On May 12, 1998, BNSF sought and obtained a temporary restraining order restraining BMWE from striking and picketing any of BNSF's facilities. *Burlington N. & Santa Fe Ry. Co. v. BMWE*, No. 3:98–CV–0887–T, slip op. (N.D.Tex. May 12, 1998). Thereafter, on June 2, 1998, the court granted BNSF's application for preliminary injunction. *Burlington N. & Santa Fe Ry. Co. v. BMWE*, No. 3:98–CV–0887–T, slip op. (N.D.Tex. June 2, 1998). The court found that the dispute between the parties, confined to BNSF's assignment or denial of seniority to particular positions or persons when the seniority dispute concerned the application of certain rules, was a minor dispute under the RLA. The court granted BMWE's motion to dismiss BNSF's request for damages, finding that it was barred by collateral estoppel. The court refused, however, to dismiss BNSF's request for a prospective injunction to require BMWE to give notice before striking. *Burlington N. & Santa Fe Ry. Co. v. BMWE*, No. 3:98–CV–0887–T, slip op. (N.D.Tex. Oct.26, 1998).

In discovery undertaken in the above-described action, David Joynt, General Chairman for the Burlington System Division of the BMWE, testified that a strike ballot taken in May 1995 approving a strike in the event the BNSF were to make a unilateral change in the application of its agreement with BMWE authorized a May 1998 strike. Further, the term "unilateral change" told Joynt that a major dispute was involved and "of course, under the Railway Labor Act, my knowledge of it, it's a major dispute when a carrier changes the application, and we have the right to respond by self-help." Carriers' App. at 465.

The court granted BNSF's motion for a permanent injunction against striking over the issue raised in that dispute. *Burlington N. & Santa Fe Ry. Co. v. BMWE*, 93 F.Supp.2d 751 (N.D.Tex.2000). As for the request for a permanent injunction mandating three days' notice of future strikes, the court stated:

> [T]he court recognizes and is not unsympathetic to the fact that BNSF has sustained substantial losses from BMWE's strikes over minor disputes, even when, as here, the strike was promptly enjoined. The Court further recognizes

that under binding Fifth Circuit precedent which prohibits monetary damages for violation of the RLA, *Burlington N.R.R. Co. v. BMWE*, 961 F.2d 86, 88–89 (5th Cir.1992), a rail carrier is without a remedy for the damage it sustains when a union deliberately strikes over a minor dispute and takes steps to keep the strike secret so that the carrier cannot obtain a temporary restraining order until the damage has been done. The summary judgment evidence shows that BMWE is at least aware of this "loophole" in the law, and its potential for exploitation to BMWE's advantage. The Court's holding that BNSF is not entitled to an advance notice injunction against BMWE on the record before the Court in no way precludes BNSF from obtaining such an injunction against BMWE in the future, if BNSF can make the requisite factual showing at that time.

*Id.* at 759–60.

In August 1998, the United States District Court for the Eastern District of Pennsylvania issued a temporary restraining order restraining BMWE from striking Conrail. *Consol. Rail Corp. v. BMWE*, No. 98–CV–4277, slip op. (E.D.Pa. Aug. 14, 1998). According to the UTU Daily News Digest, the parties agreed to extend the injunction until the completion of certain track work in Marysville, Ohio. Carriers' App. at 490. "The strike, which caught Conrail by surprise, left rail yards around the Northeast and Midwest quiet. Most of Conrail's 16, 000 other workers honored the strike, leaving freight shipments stuck in stations and disrupting passenger service on rail lines sharing track with Conrail." *Id.*

In November 1999, UP announced that it was changing its policy for acquiring switch panels and track panels and that it would be closing its Laramie, Wyoming,

panel plant. BMWE notified UP that it considered the changes to be a major dispute under the RLA. BMWE filed a lawsuit in the District of Colorado and commenced a strike. UP filed its own action in Nebraska, alleging that the BMWE had called an illegal strike over a minor dispute. The Nebraska judge agreed and issued an order temporarily enjoining BMWE from continuing its strike. The court then transferred the action to Colorado, where the BMWE's action was already pending. Carriers' App. at 494. The Colorado district court disagreed with the Nebraska court's conclusion that the dispute was minor. It issued an order granting BMWE's motion for preliminary injunction enjoining UP from going forward with its plans. *BMWE v. Union Pac. R.R.*, No. 00–Z–396, slip op. (D.Colo. Mar. 9, 2000). On appeal, the United States Court of Appeals for the Tenth Circuit reversed. *BMWE v. Union Pac. R.R.*, No. 00–1105, 2000 U.S.App. LEXIS 33454 (10th Cir. Dec. 21, 2000). The Tenth Circuit found that, because the dispute at issue could be resolved by application and interpretation of the existing collective bargaining agreement, it was a minor dispute. A BMWE news release following the ruling by the Colorado district court quoted officials as stating that BMWE would strike again under similar circumstances. In particular, "when any railroad decides to blatantly act against the clear language of our contracts after repeated requests to cease their illegal acts, BMWE will act in the best interests of our members." Carriers' App. at 501.

In March 2000, CSX filed suit in the United States District Court for the Middle District of Florida seeking to enjoin a strike over contracting out of maintenance of way work. *CSX Transp., Inc. v. BMWE*, No. 3:00–CV–237–J–20A (M.D.Fla.2000). The court granted a tem-

porary restraining order finding that the disputes between the parties were minor, because they could be resolved based on an interpretation of existing collective bargaining agreements. The court further found that a work stoppage by BMWE and its failure to provide advance notice of such a work stoppage violated § 2 First of the RLA. *Id.*, slip op. at 4 (M.D.Fla. March 9, 2000). In response, BMWE issued a news release stating in pertinent part:

> As a result of the CSXT purchase of 40 percent of Conrail in June 1999, the BMWE and CSXT entered into a new collective bargaining agreement to integrate the newly acquired property into CSXT operations. The agreement was explicitly designed to reserve BMWE work to BMWE members and to eliminate the sub-contracting of most bargaining unit work.
>
> Shortly after signing the agreement with BMWE, CSXT began to regularly sub-contract core bargaining unit work in the form of routine maintenance and regular programmed repairs such as renewals and rehabilitation of tracks, roadbed and structures. CSXT has acted as if the new agreement provision reserving work to the BMWE members does not exist. Despite repeated meetings with the BMWE, CSXT has done nothing to halt their unilateral change of the collective bargaining agreement in effect between BMWE and CSXT. There is no question that the agreement in effect between BMWE and CSXT does not permit the avalanche of sub-contracting done by CSXT.
>
> . . . .
>
> Management knows full well that our agreement does not permit the sub-contracting of this work. . . .

Carriers' App. at 514–15. After an evidentiary hearing, the court granted CSX a preliminary injunction and directed the parties to enter into arbitration as provided by the RLA. *CSX Transp., Inc. v. BMWE*, No. 3:00–CV–237–J–21A consolidated with No. 3:00–CV–264–21B, slip op. (M.D.Fla. March 24, 2000).

On May 4, 2000, BMWE issued a news release describing a strike against NS. The reason for the strike was described as follows:

> [M]anagement unilaterally abrogated the bulletin and assignment rules in the collective bargaining agreement between the former N & W property and BMWE. The collective bargaining agreement contains provisions which expressly state that all vacancies and positions be announced by "bulletins" containing specified information, that employees may "bid" for such positions, and that such positions must be filled in accordance with the seniority of bidders as specified in the collective bargaining agreement.

Carriers' App. at 530. NS filed suit in the United States District Court for the Western District of Virginia and obtained a temporary restraining order. *Norfolk S. Ry. Co. v. BMWE*, No. 98–0377–R, slip op. (W.D.Va. May 4, 2000). Among other things, the court found that:

> 6. Defendant BMWE was dismissed from a prior civil action in this Court (Civil Action No. 97–740–R) based on the commitments of defendants BMWE and Fleming, in a settlement agreement with the plaintiffs, that, among other things, "BMWE will not strike in response to the implementation of the [Conrail] transaction by the railroads pursuant to the [Surface Transportation] Board's authorization."

*Id.* at 2. Thereafter, the temporary restraining order was converted into a preliminary injunction. *Norfolk S. Ry. Co. v. BMWE*, No. 98–0377–R, slip op. (W.D.Va. May 12, 2000).

Most recently, BMWE struck plaintiff KCS over a dispute involving subcontracting. In that case, KCS officials heard about the strike (which was planned in secret and scheduled to begin at 5:00 a.m. on Monday, January 22, 2001) on Sunday afternoon, January 21, 2001. KCS was able to obtain a temporary restraining order from the United States District Court for the Western District of Louisiana, Shreveport Division, at 9:00 p.m. that night. *Kansas City S. Ry. Co. v. BMWE*, No. CV01–0125–S, slip op. (W.D.La. Jan. 21, 2001). However, notice of the last-minute injunction did not reach everyone in time, and pickets appeared at four locations on the KCS system. The case was tried on February 21, 2001. Judge Stagg made his findings of fact and conclusions of law during a telephone conference with counsel the following day. *Id.*, tr. of 2–22–01 hearing. He found, in pertinent part:

> Despite statutory and contractual restraints, the Union instituted a system-wide strike against KCS without warning. This is in clear violation of at least two provisions of the RLA: Section 152, first and second, requiring a carrier and union to attempt a voluntary good faith settlement of all disputes; and second, Section 153, establishing the exclusive jurisdiction of the National Railway Adjustment Board over minor disputes.

*Id.* at 13. The court permanently enjoined BMWE from calling or continuing any strike against KCS in connection with the matters before the court. *Id.* at 13–14.

Strikes are intended to interfere, and do interfere, with interstate commerce. The shutdown of rail service interferes with transportation of supplies essential to the public, such as U.S. mail, food, fuel, and military equipment, as well as with commuter and passenger rail operations. In addition to suffering immediate, substantial revenue loss, carriers face long-term loss of customers as a result of strikes by BMWE.

Other reasonable inferences to be drawn from the undisputed evidence are discussed at later points in the Memorandum Opinion and order.

## VI.

### *Summary Judgment Burdens*

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248, 256, 106 S.Ct. 2505. To meet this burden, the nonmovant·must "identify specific evidence in the record and articulate the 'precise manner'

in which that evidence support[s][its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994). An issue is material only if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyons*, 746 F.2d 265, 269 (5th Cir.1984). Nor will debates over the consequences flowing from undisputed facts prevent summary judgment. *Burlington N. & Santa Fe Ry. Co. v. BMWE*, 93 F.Supp.2d at 756.

The standard for granting a summary judgment is the same as the standard for a directed verdict. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 597, 106 S.Ct. 1348.

## VII.

### *Other Pertinent Legal Principles*

A. *The Effect of the Norris–LaGuardia Act*

The NLGA "expresses a basic policy against the injunction of activities of labor unions." *International Ass'n of Machinists v. Street*, 367 U.S. 740, 772, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). BMWE maintains that the injunctive relief sought by Plaintiffs is prohibited by the NLGA. on the other hand, Plaintiffs assert that, notwithstanding the NLGA, injunctive relief can be granted against a union if necessary to enforce the provisions of the RLA.

In *Brotherhood of Railroad Trainmen v. Chicago River Indiana Railroad,* the Supreme Court made clear that the provisions of the NLGA do not prevent a court from granting injunctive relief "to vindicate the processes of the Railway Labor Act" and to enforce the procedures the RLA prescribes for resolution of minor disputes. 353 U.S. 30, 40–42, 77 S.Ct. 635, 1 L.Ed.2d 622. The Court applied a principle it had announced in *Brotherhood of Railroad Trainmen v. Howard,* 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), that "the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris–LaGuardia Act." 353 U.S. at 41–42, 77 S.Ct. 635. The Fifth Circuit has applied the principles expressed in *Chicago River. Missouri–Kansas–Texas R.R. v. Bhd. of R.R. Trainmen,* 342 F.2d 298, 299 (5th Cir.1965) (holding that, "while the Norris–LaGuardia Act may well operate to deprive a district court of jurisdiction to grant injunctive relief in a 'major' railway labor dispute as to which the procedure prescribed by the Railway Labor Act has been exhausted, it is settled that the Act does not deprive a district court of jurisdiction to enjoin a strike arising out of a 'minor' dispute which is within the jurisdiction of the National Railroad Adjustment Board and which has been submitted to the Board.").

The Court noted in *Chicago River* that the NLGA might affect a court's ability to grant injunctive relief in the event of a major dispute, 353 U.S. at 42 n. 24, 77 S.Ct. 635 but since then the Court has noted that, notwithstanding the NLGA, a strike injunction can be a means of enforcing compliance with mandates of the RLA related to such a dispute, *Burlington N.R.R. v. BMWE,* 481 U.S. 429, 445–46 & n. 11, 107 S.Ct. 1841 (1987); *Chicago & N.W. Ry. Co.,* 402 U.S. at 581–83, 91 S.Ct. 1731. As the D.C. Circuit explained in *Delaware & Hudson Railway Co.:*

> The Norris–LaGuardia Act has withdrawn the power of the Federal courts to issue injunctions in labor disputes. That prohibition is subject to an over-

riding doctrine permitting the issuance of an injunctive order in order to enforce compliance with the requirements of the Railway Labor Act.

450 F.2d at 611 (footnote omitted). *Texas International Airlines, Inc. v. Air Line Pilots Ass'n* is typical of the cases in which an injunction was granted to enforce the provisions of the RLA pending exhaustion of the procedure prescribed by the RLA in the event of a major dispute. 518 F.Supp. 203 (S.D.Tex.1981). The court in that case reached the following legal conclusions that apply as well to the instant case:

> Under the Railway Labor Act, parties in a major dispute have a statutory duty to fully exhaust statutorily mandated notice and mediation procedures before resorting to self-help measures such as a strike or work slowdown. . . .

> Federal Courts may issue injunctions to enjoin compliance with mandates of the Railway Labor Act.

> . . . .

> . . . [T]he purpose of injunctive relief under the Railway Labor Act is to prevent the parties in a labor dispute from resorting to self-help and disrupting the status quo prior to the exhaustion of mandatory mediation efforts. Therefore, the policy of the Railway Labor Act, i.e. to prevent interruptions of common carrier service by pr[e]scribing detailed procedures for the peaceful settlement of labor disputes, may be vindicated with a court injunction.

> . . . .

> . . . [I]t is well settled that injunctions issued to enforce obligations of the Railway Labor Act are to be accommodated with the Norris–LaGuardia Act only to the extent that the policies of the latter are not inconsistent with the policies of the former.

> . . . .

. . . [Section] 9 of the Norris–LaGuardia Act (29 U.S.C. § 109) must yield to the Railway Labor Act which authorizes injunctions to avert threatened interference with mandated mediation procedures.

*Id.* at 215–18 (citations omitted).

■ Title 29 U.S.C. § 104 enumerates specific acts that cannot be enjoined. But, the power of the federal courts to enjoin a violation of the RLA is "not negatived by or subject to Section 4 of the Norris–LaGuardia Act [29 U.S.C. § 104]." *Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R.*, 385 F.2d 581, 613 (D.D.C.1967). The D.C. Circuit said, "[t]he point is, simply that Congress did contemplate actions to effectuate the Railway Labor Act by enjoining violations" and that "[t]hat purpose would be utterly defeated if the federal court actions involved were subject to Section 4 of the Norris–La Guardia Act [29 U.S.C. § 104], which had provisions for withholding injunctions in labor disputes reflecting entirely different objectives." *Id.* at 613–14.

In *Delta Air Lines v. Air Line Pilots Ass'n, International*, 238 F.3d 1300 (11th Cir.2001), *petition for cert. filed*, 69 U.S.L.W. 3619 (U.S. March 2, 2001) (No. 001385), the Eleventh Circuit, after first recognizing the rule that, when a specific provision of the RLA is implicated, the federal courts have jurisdiction and power to issue necessary injunctive orders to enforce compliance with the RLA notwithstanding the provisions of the NLGA, *id.* at 1306, stated that it is clear that § 152 First is just such a provision, explaining:

> It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a "specific provision" of the RLA and, moreover, is central to the purpose and functioning of the RLA. Therefore, the provision takes precedence over the more general provisions of the NLGA.

This is not to say that the procedural standards of the NLGA do not apply, but only that the substance of the RLA is controlling. We therefore hold that when this specific provision of the RLA is implicated and there is no other effective way to enforce the RLA, the NLGA does not prohibit a federal court from issuing an appropriate injunction.

*Id.* at 1307. And, more to the point as to the instant case, the court said:

> Further, this dispute centers on 45 U.S.C. § 152 First, which imposes a statutory obligation "to exert every reasonable effort to make and maintain agreements." This clear statutory provision is at the heart of the RLA and is clearly within the province of the federal courts to enforce. When the public interest, commerce, and a clear statutory provision are implicated, we will not shy away from holding the parties to their duties under the RLA so as to avoid "any interruption to commerce." 45 U.S.C. § 152 First.

*Id.* at 1307–08.

However, the Supreme Court, while recognizing the principle that the NLGA does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the RLA, has cautioned that, even when a violation of the RLA has been shown, courts should hesitate to grant an injunction against union activity "unless that remedy alone can effectively guard the plaintiff's right." *Int'l Ass'n of Machinists*, 367 U.S. at 773, 81 S.Ct. 1784.

Potential applicability of the NLGA is a subject to which the court will return in the discussion of the proof requirements for a permanent injunction.

**B.** *A Damage Remedy is Not Available to Guard Plaintiffs' Rights*

 In *Louisville Nashville Railroad v. Brown*, the Fifth Circuit held that § 152

First does not establish a statutory right of action for damages for a breach of the duty it creates. 252 F.2d 149, 155 (5th Cir.1958). Similarly, a railroad does not have a right to recover damages by reason of a breach of § 153 First (i). *Burlington N.R.R. v. BMWE*, 961 F.2d 86, 89 (5th Cir.1992). The law of the Fifth Circuit is now quite clear that a carrier has no cause of action under the RLA for damages caused by an illegal strike due to a minor dispute. *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 584 (5th Cir. 2000), *cert denied,* —— U.S. ——, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001). The court concludes that under Fifth Circuit law a railroad would have no right to recover damages suffered by it as a result of a union's violation of the RLA whether the violation was related to a major dispute or to a minor dispute.

**C.** *The Proof Requirements For a Permanent Injunction*

The prerequisites generally applicable for the grant of a preliminary injunction were enumerated by the Fifth Circuit in *Canal Authority of State of Florida v. Callaway:*

> The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

489 F.2d 567, 572 (5th Cir.1974). Generally speaking, the standard for a permanent injunction is the same as the standard for a preliminary injunction except that, in the case of the former, the plaintiff must actu-

ally succeed on the merits rather than to merely show, as in the case of the latter, a likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

■ However, the NLGA has procedural requirements that, generally speaking, must be satisfied before a court of the United States has jurisdiction "to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute ...," including requirements that there must first be a hearing in open court for the taking of testimony of witnesses in support of the allegations of the complaint, and testimony in opposition thereto, if offered, and that specified findings of fact be made. 29 U.S.C. § 107. Title 29 U.S.C. § 108 prohibits the granting of a restraining order or injunctive relief "to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." Title 29 U.S.C. § 109 provides that:

> No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction; and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter.

Plaintiffs' basic position is that none of the provisions of the NLGA is applicable to an action, such as this one, to enforce the RLA; and, they alternatively contend that the open-court hearing requirement of § 107 is inapplicable because the facts are undisputed, that §§ 108 and 109 do not apply, and that the court can find from the undisputed evidence in the summary judgment record the existence of all facts that would have to be found in order to satisfy the fact-finding requirements of § 107. BMWE maintains that all of the provisions of the NLGA apply, and that they prevent the grant of any injunctive relief here.

In *Brotherhood of Railroad Trainmen v. Toledo Peoria Western Railroad*, the Supreme Court held that § 108 was applicable in that case even though the injunctive relief was being sought to prevent a violation of the RLA. 321 U.S. 50, 55–6, 64 S.Ct. 413, 88 L.Ed. 534 (1944). In contrast, in *Virginian Railway Co. v. System Federation No. 40, Railway Employees Department of the American Federation of Labor*, the Court held that § 109 was inapplicable to the injunction at issue in that case, explaining that the provisions of the NLGA can affect an RLA-related injunction "only so far as its provisions are found not to conflict with [the applicable provisions] of the Railway Labor Act, authorizing the relief which has been granted." 300 U.S. 515, 562–63, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

In *Akron & Barberton Belt Railroad*, the D.C. Circuit considered the applicability to an RLA injunction action of § 108. After recognizing the Supreme Court's admonition that there must be an accommodation of the NLGA with the RLA, the court explained that the "principle of accommodation means that actions to enjoin violations of the Railway Labor Act may be maintained without regard to Section 4 of the Norris–La Guardia Act [29 U.S.C.

§ 104], and yet be subject to Section 8 of that Act [29 U.S.C. § 108]." 385 F.2d at 613. Nevertheless, the Court said that in particular cases "the imperatives of the Railway Labor Act override [§ 108] . . ., particularly where it is the public interest involved." *Id.* at 614.

The approach taken by the D.C. Circuit in *Akron & Barberton Belt Railroad* is not unlike that a district court in D.C. took in *Alton & Southern Railway Co. v. BMWE*, 883 F.Supp. 755, *amended*, 899 F.Supp. 646 (D.D.C.), *aff'd*, 1995 WL 686177, 72 F.3d 919 (D.C.Cir.1995). As it does in the instant action, in *Alton* BMWE argued that the NLGA deprived the plaintiff carriers their standing to seek an injunction to prevent violations of the RLA. BMWE apparently conceded that courts may in some instances enjoin violations of the RLA, but argued that § 108 deprived the carriers there of standing to request an injunction because of their failure to comply with their obligation to bargain under the RLA and to make every reasonable effort to settle the dispute that gave rise to the litigation. *Id.* at 759–60. The court said that an equitable approach could be taken, making an injunction proper "even though one side does not have completely clean hands, especially if there is a strong public interest involved," and, "[a]dditionally, if it is unclear whether [§ 108] applies, a court may issue a restraining order to avoid jeopardizing the RLA." *Id.* at 763. In the final analysis, the court applied the factors generally used in the D.C. Circuit for determining whether to grant a request for injunctive relief, *id.* at 764, which are essentially the same as the factors mentioned above as the prerequisites generally applied in the Fifth Circuit.

The parties have cited as Fifth Circuit cases that bear on the issue under discussion *Louisville & Nashville Railroad v. Brown*, 252 F.2d 149 (5th Cir.1958); *Mis-souri–Kansas–Texas Railroad v. Brotherhood of Locomotive Eng'rs*, 266 F.2d 335 (5th Cir.1959), *rev'd on other grounds*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960); *Flight Engineer's International Ass'n, AFL—CIO v. American Airlines, Inc.*, 303 F.2d 5 (5th Cir.1962); and, *Railway Express Agency, Inc. v. Brotherhood of Railway Airline & Steamship Clerks*, 437 F.2d 388 (5th Cir.1971). In *Brown*, the Fifth Circuit simply recognized, insofar as the opinion is pertinent to the instant action, that an injunction would lie to prevent the frustration of the dispute resolution procedures mandated by the Railway Labor Act. In *Brotherhood of Locomotive Engineers*, the union contended that the anti-strike injunction granted the railroad was improper because no testimony of witnesses was heard in open court before the injunction was issued, nor did the district court make any findings of fact, all as contemplated by 29 U.S.C. § 107. In rejecting the union's contentions, the Fifth Circuit noted that the material facts were admitted, and that "[u]nder such circumstances the specific provisions of the Railway Labor Act . . . take precedence over the more general provision of the Norris–LaGuardia Act." 266 F.2d at 239. Notwithstanding the noncompliance with § 107, the Fifth Circuit concluded that "the district court had jurisdiction to grant the preliminary injunction against a strike in this labor dispute in order to protect the primary jurisdiction of the National Railroad Adjustment Board to resolve the dispute." *Id.* at 340. In *American Airlines, Inc.*, the Fifth Circuit said that § 107 should be considered by a court in evaluating whether to grant or deny an injunction to preserve the status quo in an RLA context, explaining:

Of course, all of this analysis on competing factors inherent in the question to grant or deny a preliminary injunction to preserve the status quo must be

read in the light of the Norris–LaGuardia Act, 29 U.S.C.A. § 107. To this extent review by us involves so much of the merits as to determine whether there was a probable substantial basis for concluding that this controversy was outside the pale of that Act.

303 F.2d at 12. The court determined that the dispute at issue there was a minor dispute, and concluded that "it is now clear that despite the literal words of the Norris–LaGuardia Act a Federal Court does have the power—and should exercise it— to enjoin strikes or other actions until the determination of pending controversies by the grievance machinery of the Board of Adjustment" and that there must be an accommodation of the NLGA and the RLA so that the obvious purpose in the enactment of each is preserved. *Id.* The procedures contemplated by § 107 were again the subject of dispute in *Railway Express Agency.* The union complained that the district court's order permanently enjoining it against further picketing of Railway Express Agency was defective because of the failure of the district court to comply with NLGA prerequisites to granting an injunction, including the § 107 requirement that there be a hearing at which testimony is taken in open court. 437 F.2d at 395. In the course of rejecting that complaint, the Fifth Circuit referred back to its opinion in *Brotherhood of Locomotive Engineers,* and again held that the injunction granted by the district court was not imperiled by noncompliance with § 107, noting that there was no dispute as to the crucial facts. *Id.*

Also significant to the § 107 discussion is *Delta Air Lines, Inc. v. Air Line Pilots Ass'n International,* 238 F.3d 1300. The Eleventh Circuit held, as has the Fifth Circuit, that there does not need to be adherence in an RLA injunction case with the open-court hearing feature of § 107 if there is no dispute about the reliability of the evidence, saying that "[t]he purpose of section 107 is served if the evidence is inherently reliable and there is no harm to the parties." *Id.* at 1311.

The court has concluded that a proper accommodation of the NLGA with the RLA in the instant action causes §§ 107, 108, and 109 not to be prerequisites to the relief requested by plaintiffs against BMWE. Nevertheless, for the most part the court is giving effect to the fact-finding requirements of parts (a), (b), (c), and (d) of § 107. Here, the court's summary judgment rulings are being made on the basis of undisputed evidence; and, BMWE has had ample opportunity to present whatever evidence it might wish to adduce in opposition to the evidence plaintiffs have put in the summary judgment record. No claim has been made that the provisions of § 108 could have a bearing on the outcome of this case. As to § 109, this opinion serves as findings of fact made and filed by the court in the record of this case prior to the issuance of an injunction, with the consequence that the fact-finding feature of § 109 would have been satisfied if it were otherwise applicable; and, an argument reasonably could be made that the remaining feature of § 109 also would have been satisfied because the injunctive relief being granted to plaintiffs is basically the same as the injunctive relief sought by the complaint and is the product of the conduct about which plaintiffs complain, which is described in fact-findings contained in this memorandum opinion.

## VIII.

*Authority Supporting Grant of Prospective Injunctive Relief Requiring Notice*

The Supreme Court explained in *United States v. W.T. Grant Co.,* "the court's power to grant injunctive relief survives dis-

continuance of the illegal conduct" because "[t]he purpose of an injunction is to prevent future violations." 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The Court continued, "The necessary determination is that there exists some cognizable danger of recurrent violation. . . ." *Id.* In *Shanks v. City of Dallas,* the Fifth Circuit applied the rules expressed in *W.T. Grant Co.* as being determinative of when permanent equitable relief would be appropriate. 752 F.2d 1092, 1097 (5th Cir.1985).

A notice injunction similar to the one plaintiffs seek here was sought by BNSF in an action it brought against BMWE in 1998 in the Dallas Division of this court. *Burlington N. & Santa Fe Ry. Co. v. BMWE,* No. 3:98–CV–0887–T (N.D.Tex.). There, BMWE moved to dismiss the complaint for failure to state a claim, urging that such an injunction was prohibited by the provisions of the NLGA, and, as it does in the instant action, citing *United States Steel Corp. v. United Mine Workers of America,* 519 F.2d 1236 (5th Cir.1975), as Fifth Circuit authority that such an injunction could not be granted. The reasoning of Judge Maloney of the Dallas Division rejecting BMWE's contentions applies as well here:

> The Union does not dispute the Court's ability to issue an injunction to enforce the RLA, but it asserts that the type of injunction requested by Burlington violates section 9 of the NLGA and the Fifth Circuit's holding in *United States Steel Corp. v. United Mine Workers of America,* 519 F.2d 1236 [90 LRRM 2539] (5th Cir.1975).
>
> Section 9 of the NLGA provides that a labor injunction contain "only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by

the court." 29 U.S.C. § 109. In balancing section 9 of the NLGA with the Labor Management Relations Act, the Fifth Circuit, in *United States Steel,* held that a prospective final injunction against strikes over arbitrable grievances and local trouble of any kind violated the NLGA. 519 F.2d at 1245. The court stated, "Such overbroad use of the injunction is the very evil Norris–LaGuardia sought to remedy." *Id.*

> However, the Court finds unpersuasive the Union's argument that the Fifth Circuit's decision in *United Steel* requires dismissal of Burlington's claim. *United States Steel* involved a prospective final injunction against virtually all strike activity, whereas Burlington's requested injunction would only require notice before a strike. In light of the well-established Supreme Court authority granting district courts the power to issue "necessary injunctive orders" to enforce the RLA, the Court finds that Burlington has stated a valid claim for a prospective injunction. *See Pittsburgh & Lake Erie R.R. Co.,* 491 U.S. at 513, 109 S.Ct. 2584. Burlington may be able to produce facts justifying the requested injunctive relief.

*Burlington N. & Santa Fe Ry. Co. v. BMWE,* No. 3:98–CV–0887–T, 1998 WL 1545483, at *4, (N.D.Tex. Oct.26, 1998). When Judge Maloney decided the case on the merits, he declined to grant the requested notice injunction, but was careful to point out that under a different record such an injunction might well be appropriate. 93 F.Supp.2d at 759–60.

In *Delaware & Hudson Railway,* the D.C. Circuit wrote that the obligations of carriers and labor alike under the RLA "to treat with each other through 'responsible conduct of the process of collective bargaining' . . . . is not consistent with such actions as a deliberate timing of a strike

without prior warning, with the purpose of enhancing plant damage, or some other garrotte of jungle warfare." 450 F.2d at 622 (quoting *Brh. of R.R. Trainmen v. Akron & B.B.R.R.*, 385 F.2d 581, 596 (D.D.C.1967)). In support of a requirement that the union give two weeks advance notice of intent to strike, the D.C. Circuit said:

> We think the continuing duty of responsible bargaining under the [RLA] fairly embraces reasonable notice of a strike or lockout or other self help. In a land conversant with the tradition of two weeks notice for a discharge, that would seem a bench mark for reasonable notice. While a requirement of reasonable notice may be unwelcome to the Union as providing time for counter-measures, it is a limited interference with the protected freedoms that our judgment safeguards, and one that is appropriate in view of the purpose of the Act to achieve resolution of disputes as far as possible through responsible bargaining.

*Id.* at 622–23.

## IX.

### *The Court Is Denying the Requests for Declaratory Relief*

While the declarations sought by plaintiffs are accurate statements of law, and even though the court does not doubt that a justiciable controversy exists, the court has concluded that it should exercise its discretion to decline to grant the declaratory relief sought by plaintiffs. *See Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28–29 (5th Cir.1989).

Steps the court has taken in the process of concluding that injunctive relief should be granted plaintiffs in this action include determinations by the court in favor of plaintiffs that (1) the legal principles plaintiffs are asking the court to declare are meritorious, (2) BMWE has a pattern,

practice, and policy of authorizing, encouraging, permitting, calling, or engaging in strikes, work stoppages, picketing, and other self-help against plaintiffs and their subsidiaries over what BMWE claims are unilateral changes in agreements, and (3) 45 U.S.C. § 152 First creates a duty that is violated by BMWE's pattern, practice, and policy. Thus, the court is ruling for plaintiffs on the merits of their claims through the process of deciding that injunctive relief should be granted. Nothing further would be gained by the grant of plaintiffs' requested declaratory relief. As to the declaratory relief sought by BMWE by its counterclaim, the summary judgment record would not support grant of the relief even if it otherwise would be appropriate. Therefore, the court is dismissing all requests for declaratory relief.

## X.

### *Injunctive Relief as Requested by Plaintiffs Should be Granted*

■ The court's first reaction after an initial study of the record and a preliminary review of the legal authorities was that the summary judgment record would support no more than the grant of an injunction requiring BMWE to give notice to the affected carrier-plaintiff before engaging in a strike, or other interference with that carrier's normal operations, over a minor dispute. However, after a more thorough study of the record and a further review of the legal authorities, the court has concluded that a broader notice-injunction should be ordered even if it has the potential to require BMWE to give notice before conducting a strike over a major dispute. The RLA prohibits BMWE from engaging in a strike over a major dispute before the dispute resolution procedure prescribed by the RLA has been exhausted just as effectively as it prohibits a

strike over a minor dispute. A strike in either event would be a direct affront to the purpose and scheme of the RLA.

Plaintiffs' complaint seeks the broader form of injunction by defining the disputes that could lead to the giving of notice as "any disputes involving or concerning what defendant claims is a unilateral change in agreements during the period prior to exhaustion of the major dispute procedures." Compl. at 13. Such an injunction will, in the long run, tend to serve judicial economy by having the potential to eliminate recurrent proceedings to determine the nature of the dispute or the genuineness of any asserted belief by BMWE that the dispute is a major one. And, such an injunction is more likely to serve the goal of the RLA "to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First.

The court here adopts as fact-findings of the court all statements made in this memorandum opinion and order under the heading "Undisputed Summary Judgment Evidence." The court can, and does, infer from the facts thus found that BMWE has a pattern, practice, and policy of authorizing, encouraging, permitting, calling, or engaging in strikes, work stoppages, picketing, and other self-help against plaintiffs and their subsidiaries over what BMWE claims are unilateral changes in agreements, and that those activities have occurred in the case of minor disputes and before major dispute procedures, if they applied, would be exhausted. That pattern, practice, and policy, and the conduct of BMWE in engaging in activities of that kind without giving the affected carrier advance notice of its intent to do so, all violate BMWE's duties under § 152 First. Not only has BMWE engaged in such a pattern, practice, and policy, and such oth-

er conduct, in the past, there is a threat that BMWE will engage in similar conduct in the future in violation of BMWE's duties under § 152 First and to the detriment of plaintiffs if the court does not grant the requested equitable relief.

Section 152 First must be considered and applied in the context of the provisions of the RLA pertaining to the techniques to be followed in the resolution of major and minor disputes, as the case may be. It imposes a duty on BMWE to refrain from strikes and other forms of self-help in the case of minor disputes "in order to avoid any interruption to commerce or to the operation of any carrier growing out of" such a dispute, and, as to major disputes, to refrain from any such activity prior to exhaustion of the major dispute procedures prescribed by RLA. The strikes and other forms of self-help in which BMWE has engaged in the past, and in which it would probably engage in the future if injunctive relief is not granted, have been in violation of those duties.

Based on the past conduct of BMWE, the court finds that there is a substantial threat that plaintiffs, and each of them, will suffer irreparable injury if a notice-injunction of the kind sought by plaintiffs is not granted. If advance notice of intent to strike is required to be given, plaintiffs will be afforded an opportunity to avoid injury by obtaining injunctive relief before their railroad business is interrupted. Without the requested relief, plaintiffs will continue to be subject to ongoing threats of strikes or other business interferences planned and executed by BMWE in secret, with the object of catching the carriers by surprise, in violation of the RLA.

Because plaintiffs have no recourse against BMWE by way of recovery of damages caused by BMWE's violations of the provisions of the RLA, the requested injunctive relief is an appropriate method

of eliminating, or at least reducing, the losses plaintiffs otherwise would suffer by reason of BMWE's violations of the RLA. Plaintiffs already have suffered significant injury from the conduct of BMWE about which they have complained in this action, and probably will suffer similar injury in the future if the requested injunctive relief is not granted. In contrast, BMWE will not suffer any legally cognizable harm by the grant of the injunctive relief. Consequently, the threatened injury to plaintiffs greatly outweighs any threatened harm the injunction sought by plaintiffs may do to BMWE. The grant of the injunction will not disserve the public interest. Rather, it will further the public interest, as it has been defined by the RLA.

Consistent with the findings previously made, the court finds that BMWE has committed unlawful acts in the form of violations of the RLA, and probably will continue to do so unless restrained; that substantial and irreparable injury to the activities and business of plaintiffs will follow from those unlawful activities unless they are restrained; that greater injury will be inflicted upon plaintiffs if the injunctive relief they seek were to be denied than will be inflicted on BMWE by the granting of the relief; and, that plaintiffs have no adequate remedy at law.

For plaintiffs to have the protections they deserve, the injunctive relief being granted to them should operate against all divisions, lodges, locals, officers, agents, employees, and members of BMWE, as well as all persons acting in concert or participation with BMWE or any of them. A notice period of ten days is appropriate. Such a period will give the affected plaintiff sufficient time to react by seeking judicial relief from the threatened conduct; and, a ten-day period is not so long that it puts BMWE at a significant disadvantage if it genuinely believes under the circum-

stances that it has the right to engage in the threatened activity.

The court concludes that a grant of the injunctive relief sought by plaintiffs is necessary to vindicate the processes of the RLA. The provisions of the RLA that are vindicated by such an injunction take precedence over any provisions of the NLGA that might be viewed to be offended by the injunctive relief. A notice-injunction of the kind that is being granted will serve to avert threatened interference with the dispute resolution procedures mandated by the RLA, in the case of both major disputes and minor disputes. The equitable remedy the court is granting to plaintiffs in this action is the least restraint available that can effectively guard the rights of plaintiffs under the RLA and give effect to the purpose of the RLA to achieve resolution of disputes as far as possible through responsible bargaining. The equitable relief being granted to plaintiffs is appropriate in view of the purpose of the RLA.

\* \* \* \* \* \*

### ORDER

Consistent with the foregoing memorandum opinion:

The court ORDERS that the portion of plaintiffs' motion for summary judgment advocating grant of injunctive relief be, and is hereby, granted to the extent such relief is ordered hereby, but is denied as to its request for declaratory relief.

The court further ORDERS that BMWE's motion for summary judgment be, and is hereby, denied.

The court further ORDERS that plaintiffs, motion for summary judgment as to BMWE's counterclaim be, and is hereby, denied as moot.

The court further ORDERS that all requests of plaintiffs and BMWE for declaratory relief be, and are hereby, dismissed.

The court further ORDERS that BMWE, its divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert or participation with any of them, provide at least ten days' notice to the affected plaintiff carrier prior to authorizing, encouraging, permitting, calling, or engaging in any strike, work stoppage, picketing, or other self help against such carrier or its operating rail subsidiaries over any minor dispute or over any major dispute before the dispute resolution procedures prescribed by the RLA have been exhausted.